UNITED STATES of America,
Plaintiff-Appellee,
v.
Glen SUTHERLAND, Edward Maynard
and Grace Walker,
Defendants-Appellants.

No. 80–1422.

United States Court of Appeals,
Fifth Circuit.
Unit A

Sept. 25, 1981.
Rehearing and Rehearing En Banc
Denied Nov. 4, 1981.

---

Mitchell Esper, Charles Louis Robert, El Paso, Tex., for Walker.

Texas S. Ward, El Paso, Tex., for Sutherland.

Gary Joel Hill, El Paso, Tex., for Maynard.

LeRoy M. Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before REAVLEY, RANDALL and SAM D. JOHNSON, Circuit Judges.

RANDALL, Circuit Judge:

In this case three defendants appeal their convictions for conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO) in violation of 18 U.S.C. § 1962(d) (1976). The defendants raise a large number of issues, one of which involves an important RICO question: whether and when conspiracies that involve the same enterprise but are otherwise unrelated may be tried together under a single RICO conspiracy count. We consider the defendants' points on appeal seriatim and affirm their convictions.

## I. THE FACTS

Glen Sutherland, Grace Walker and Edward Maynard were indicted in January 1980 for conspiracy to violate 18 U.S.C. § 1962(c)[1] in violation of 18 U.S.C. § 1962(d).[2] The indictment charged, in

---

**1.** 18 U.S.C. § 1962(c) (1976) is as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

"Enterprise" is defined as follows, 18 U.S.C. § 1961(4):

"[E]nterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.

"Racketeering activity" is defined in pertinent part as follows, 18 U.S.C. § 1961(1) (emphasis added):

"Racketeering activity" means (A) any act or threat involving murder, kidnaping, gam-

bling, arson, robbery, *bribery*, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; . . . .

A "pattern of racketeering activity" is defined as follows, 18 U.S.C. § 1961(5):

"[P]attern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity.

**2.** 18 U.S.C. § 1962(d) is as follows:

It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

brief, that the three defendants "did knowingly, wilfully, and unlawfully combine, conspire, confederate, and agree together and with each other," from November 1975 until the date of the indictment, to violate section 1962(c). The conspiracy alleged by the government consisted of an agreement to associate with and to participate in the conduct of an enterprise that affects interstate commerce (the Municipal Court of the City of El Paso) through a pattern of racketeering activity (bribery of a state official in violation of state law).[3]

The alleged conspiracy centers around Sutherland, who at the time of these events was a judge of the Municipal Court. According to the government, the defendants agreed that Maynard and Walker would each collect traffic tickets from his or her friends and associates, along with the amount of the statutory fine plus a small premium ($10); that Maynard and Walker would deliver the tickets to Sutherland, who would have the cases transferred to his docket and would then favorably dispose of them; and that the money collected would in each case be split between Sutherland and whichever other defendant collected and delivered the ticket.

Although the indictment frames the conspiracy as a single agreement among all three defendants, the government did not attempt at trial to prove any agreement between Walker and Maynard. As counsel for the government explained in response to an objection by the defendants to the introduction of coconspirator hearsay:

> MR. BOCK: ... It's the government's position that the conspiracy in this case, the hub of it, is the judge [Sutherland], and his activities with these other coconspirators. And there is absolutely no requirement that they know each other or have knowledge of each other's activities.

THE COURT: Your theory is that it is a wheel-type conspiracy?

MR. BOCK: Yes, sir, exactly.

THE COURT: That there was no one conspiracy but a series of conspiracies?

MR. BOCK: Yes, sir.

Trial Transcript at 656–57.

This view of the government's case is consistent with the evidence presented at trial, which we discuss in more detail in Part II of this opinion. Briefly, we find the evidence sufficient to support each of two separate conspiracies, one between Walker and Sutherland and the other between Maynard and Sutherland. In each case the evidence is more than sufficient to establish an agreement to participate in the conduct of the Municipal Court through a pattern of racketeering activity. However, the government has pointed to no evidence in the record (and we have found none) that suggests that either Walker or Maynard knew or should have known of the other's similar agreement with Sutherland. The government's evidence as to these two defendants is entirely unrelated and, in fact, places the two conspiracies at different periods of time: the specific instances of bribery alleged between Walker and Sutherland all took place between 1975 and 1977, while those between Maynard and Sutherland all took place in 1979.

## II. THE SUFFICIENCY OF THE EVIDENCE

All three defendants challenge the sufficiency of the evidence to support their convictions under 18 U.S.C. § 1962(d). First, each argues that the government failed to establish a "pattern of racketeering activity" since the evidence does not specifically demonstrate "at least two acts of racketeering activity," as required by 18 U.S.C. § 1961(5), *supra* at note 1.[4] Second,

---

**3.** Bribery of a state official is proscribed by Tex. Penal Code Ann. § 36.02 (Vernon 1974), which provides in pertinent part as follows:

> (a) A person commits an offense if he offers, confers, or agrees to confer any benefit on a public servant, party official, or voter: (1) with intent to influence the public servant or party official in a specific exercise of his official powers or a specific performance of his official duties; ....

> (b) A public servant or party official commits an offense if he knowingly solicits, accepts, or agrees to accept any benefit on the representation or understanding that he will be influenced in a specific exercise of his official powers or a specific performance of his official duties....

**4.** All parties, as well as the district court, refer to the requisite "two acts of racketeering activity." Strictly speaking, the government need

Walker argues that the evidence does not sufficiently establish any agreement between herself and Sutherland. In considering these arguments we must read the evidence in the light most favorable to the government, and must reverse the convictions if we find that any reasonable jury thus reading the evidence must necessarily have entertained a reasonable doubt as to the defendants' guilt. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Ocanas*, 628 F.2d 353, 360 (5th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981).

### A. The Requisite "Two Acts of Racketeering Activity"

The government proved that a number of specific traffic tickets were (1) given by traffic violators to either Walker or Maynard, and (2) favorably disposed of by Sutherland in his capacity as municipal judge. Through the testimony of Sally Kalastro (a co-worker with Walker at the time of the events in question), the government identified twenty-five individual tickets that had been accepted by Walker. Through the testimony of several persons who submitted tickets to Maynard (including several bogus tickets prepared for the purpose of the investigation), the government identified fifteen individual tickets that had been accepted by Maynard. In the case of each ticket, the government introduced evidence (primarily from Municipal Court records) to establish its favorable disposition (typically a finding of not guilty) by Sutherland.

The gist of the defendants' argument is that the governments' evidence fails to prove that any one of these specific tickets was the subject of bribery. Insofar as the government's direct evidence is concerned, this statement is correct. The government does not point to any evidence that pertains to any specific ticket and demonstrates either (1) that the ticket was delivered by Walker or Maynard to Sutherland, (2) that money was delivered by Walker or Maynard to Sutherland, or (3) that Sutherland favorably disposed of the ticket in exchange for such money. Moreover, the defendants suggest a reasonable hypothesis of innocence that is consistent with the government's direct evidence as to any one ticket: a ticket that was merely given to Walker or Maynard and later favorably disposed of by Sutherland might have been successfully defended by an attorney retained by Walker or Maynard.

The fault in the defendants' argument is that it ignores the importance of the overwhelming *circumstantial* evidence introduced by the government. The government's case begins with evidence that pertains both to the Walker-Sutherland and to the Maynard-Sutherland conspiracies. This evidence establishes, in brief, that the individual tickets at issue were not processed through normal Municipal Court procedures. Only five of the forty tickets were processed through the Traffic Violations Bureau, which ordinarily assigns individual cases to the various judges, and only four of the tickets had complaints drawn up on them, although a complaint is ordinarily

not have proven that two such acts were in fact committed. This case was not brought under the substantive RICO provisions, but is instead based on the defendants' conspiracy to violate such provisions. The government need not prove in a conspiracy case that a substantive crime was actually committed, but instead need demonstrate that some "overt act" was taken in furtherance of a conspiracy to commit a substantive crime. In particular, the government need show only that "at least one conspirator committed at least one overt act in furtherance of the conspiracy." *United States v. Fuiman*, 546 F.2d 1155, 1158 (5th Cir.), *cert. denied*, 434 U.S. 856, 98 S.Ct. 176, 54 L.Ed.2d 127 (1977). The overt act need not itself constitute a substantive crime; any act, even if seemingly innocent in itself, is sufficient to sup-

port a conspiracy conviction if taken in furtherance of the conspiracy. *E. g., United States v. Winter*, 509 F.2d 975, 982 (5th Cir.), *cert. denied*, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); *United States v. Carlton*, 475 F.2d 104, 106 (5th Cir.), *cert. denied*, 414 U.S. 842, 94 S.Ct. 100, 38 L.Ed.2d 80 (1973). In this case the government's reliance on specific acts of racketeering activity is understandable, for such evidence constitutes convincing circumstantial evidence of an agreement to violate the substantive RICO provision at issue. Still, however, we find the government's exclusive reliance on these acts for the necessary "overt act" somewhat perplexing in light of the decision (whether made by the government or by the grand jury) not to indict the defendants for a substantive RICO offense.

prepared in each case that is heard by a judge. Moreover, the government introduced the testimony of two Municipal Court clerks to the effect that Sutherland regularly appeared in court with the violators' copies of traffic citations and directed the clerks irregularly to process those tickets. These clerks also testified that they were instructed by Sutherland not to discuss these irregular practices in public; that Sutherland paid the clerks for the extra work required by such practices; and that Sutherland ceased the irregular procedures when he discovered he was under investigation.

The government also introduced substantial circumstantial evidence with regard to each separate conspiracy. The government's case as to the Walker-Sutherland conspiracy rested chiefly on the testimony of Sally Kalastro. She testified that beginning in 1975 Sutherland would meet Walker in her office once or twice each week. On one such occasion in late 1975, Kalastro interrupted the meeting and observed Sutherland taking a stack of traffic citations (the violators' copies), along with a stack of money, from Walker. Kalastro testified that after Sutherland left the office, Walker chastised her for the interruption but confessed to the ticket-fixing scheme and explained to Kalastro how it operated.

The government's case as to the Maynard-Sutherland conspiracy rested chiefly on testimony concerning a series of meetings in which persons cooperating with the F.B.I. in mid-1979 sought help from Maynard with their traffic tickets (some of which were written for the purpose of the investigation). In each instance, Maynard appeared to call someone to ask the cost of taking care of a ticket; although he did not refer to Sutherland by name during the phone conversations, he referred to his contact as "the Honorable" and indicated that the contact was the only judge handling night court, which was in fact Sutherland's assignment. Moreover, Maynard referred to his activities as "fixing" or "taking care of" the citations, and insisted on payment in cash. The evidence suggests that on at least one occasion, Maynard dialed his own number and merely pretended to speak with another person as to the price necessary to take care of the ticket; however, the government's evidence shows that seventy-eight phone calls were in fact made between Sutherland's and Maynard's phones during the three month period of the investigation.

■ The appropriate standard for our examination of the sufficiency of the evidence is no different where—as here—the evidence is largely circumstantial rather than direct. *E. g., United States v. Palacios,* 556 F.2d 1359, 1364 (5th Cir. 1977); *United States v. Warner,* 441 F.2d 821, 825 (5th Cir.), *cert. denied,* 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). It is clear, therefore, that a criminal conspiracy may adequately be established purely on circumstantial evidence. *E. g., Glasser v. United States, supra,* 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Harbin,* 601 F.2d 773, 781 (5th Cir.), *cert. denied,* 444 U.S. 954, 100 S.Ct. 433, 62 L.Ed.2d 327 (1979); *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). For example, participation in a conspiracy to *distribute* illegal drugs can be established solely on the basis of the *quantity* of drugs in the possession of the defendants; at some point the circumstance of enormous quantity excludes all reasonable hypotheses of innocence despite the absence of direct evidence of an intent to distribute. *E. g., United States v. Perez,* 648 F.2d 219, 221 (5th Cir. 1981) ("The defendants could not, even if they were chain smokers, personally consume this quantity of marijuana in their lifetime.")

■ The government established through direct evidence that a number of specific traffic tickets were given to Walker and Maynard and were later favorably disposed of by Sutherland. The government did not demonstrate through direct evidence that any one of these tickets was actually given to Sutherland in the conduct of a bribe. However, such facts may adequately be established by circumstantial evidence. In this case, the exceptionally irregular treatment of the tickets, Walker's earlier meetings with Sutherland and admission of a ticket-fixing scheme, and Maynard's conversations with several "customers," consti-

tutes convincing evidence of bribery as to the individual tickets at issue. We conclude that the evidence is more than sufficient to support the charge.

## B. The Agreement

██ Walker argues that the government's evidence was insufficient to establish an agreement with Sutherland to violate 18 U.S.C. § 1962(c). Her argument seems similar to that advanced by all the defendants with respect to the requisite two acts of racketeering. In particular, Walker argues that the government advanced no direct evidence of any agreement between Sutherland and herself.

The government was indeed obligated to establish an actual agreement to commit a substantive RICO offense. "To be convicted as a member of an enterprise conspiracy, an individual, by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes." *Elliott, supra,* at 903 (emphasis deleted). In this case, however, we find that the government did introduce direct evidence of such an agreement: Kalastro's testimony as to Walker's admission of a ticket-fixing scheme between herself and Sutherland. Moreover, that agreement, like the predicate crimes discussed above, may be established by circumstantial evidence. In this case an agreement is sufficiently established by the large number (twenty-five) of individual racketeering acts which the jury was entitled to find were committed by Walker and Sutherland. "Where, as here, the evidence establishes that each defendant, over a period of years, committed several acts of racketeering activity in furtherance of the enterprise's affairs, the inference of an agreement to do so is unmistakable." *Elliott, supra,* at 903.

**5.** In this case the government introduced no evidence from which a jury could conclude that a single conspiracy existed among the defendants. This case should be distinguished, therefore, from cases in which the record contains, in addition to evidence of multiple conspiracies, sufficient evidence to support a finding of a single conspiracy. If the government sufficiently supports its charge of single conspiracy,

## III. THE MULTIPLE CONSPIRACY DOCTRINE AND RICO

### A. The Trial of Multiple Conspiracies Under a Single RICO "Enterprise Conspiracy" Count

██ It is now well settled that a material variance between the indictment and the government's evidence is created by the government's proof of multiple conspiracies under an indictment alleging a single conspiracy.[5] This "multiple conspiracy doctrine" is commonly illustrated by the Supreme Court's decision in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The indictment in *Kotteakos* alleged a single conspiracy to obtain government loans by making fraudulent representations, but the government's proof at trial, by its own admission, demonstrated eight separate conspiracies. The common element in these conspiracies consisted solely of one man who had directed each group; aside from this single defendant, there was no connection among the various agreements. Despite their similar objectives and despite their common leadership, none of the *Kotteakos* conspiracies aided or benefited from the others, and no member of the various conspiracies (other than the leader) was aware of the others. As the Court aptly described these multiple conspiracies, the pattern established by the government consisted of "separate spokes meeting in a common center" but "without the rim of the wheel to enclose the spokes." 328 U.S. at 755, 66 S.Ct. at 1243. Absent some connection (the rim) among the various conspirators (the spokes), the government's proof established multiple conspiracies. The Court held that such proof created a material variance with an indictment charging a single conspiracy and, as such, was reversible error unless the defendants' substantial rights had not been affected.

evidence at trial of multiple conspiracies does not of itself create a material variance with the indictment; at most, such evidence creates a fact question and entitles the defendants to a jury instruction on the possibility of multiple conspiracies. *See United States v. Elliott, supra,* at 905, *United States v. Varelli,* 407 F.2d 735, 746–47 (7th Cir. 1969).

328 U.S. at 755–56, 66 S.Ct. at 1243–44. *See, e. g., United States v. Elliott,* 571 F.2d 880, 900 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. Baldarrama,* 566 F.2d 560, 565–66 (5th Cir.), *cert. denied,* 437 U.S. 906, 98 S.Ct. 3094, 57 L.Ed.2d 1136 (1978); *United States v. Cruz,* 478 F.2d 408, 413–14 (5th Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973).[6]

In this case the government has by its own admission, as in *Kotteakos,* introduced no evidence of a single conspiracy but has instead rested its case on two distinct multiple conspiracies. The government did not attempt at trial to prove an agreement among all three defendants, but instead sought to establish separate conspiracies comprised of (1) Walker and Sutherland, and (2) Maynard and Sutherland. Like the multiple conspiracies in *Kotteakos,* these agreements share a common conspirator and similar objectives, but are otherwise unrelated. The government does not suggest that either bribery scheme was dependent on or benefited from the other, and does not dispute the defendants' contentions that neither Walker nor Maynard knew or should have known of the other. "If there is not some interaction between those conspirators who form the spokes of the wheel as to at least one common illegal object, the 'wheel' is incomplete, and two conspiracies rather than one are charged." *United States v. Levine,* 546 F.2d 658, 663 (5th Cir. 1977).

Of course, the government need not always demonstrate an actual agreement among the various conspirators, or even actual knowledge of each other, in order to establish a single conspiracy. In *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), the Supreme Court recognized that in some cases the interde-

---

**6.** A strong argument can be made that a variance between a single conspiracy indictment and evidence of multiple conspiracies should be treated not as a "variance" problem at all, but rather as a "misjoinder" question under Federal Rule of Criminal Procedure 8(b). *See* J. Moore, 8 *Moore's Federal Practice* ¶ 8.06[4] (1981). Rule 8(b)—which was enacted *after* the Supreme Court's decision in *Kotteakos*—is aimed at precisely the problem faced in that case: the transference of guilt among defendants who should not have been joined together in a single trial. The treatment of the multiple conspiracy doctrine as a variance issue despite the subsequent development of Rule 8(b) arguably creates a serious anomaly in the law. If the government indicts several defendants under a single conspiracy count and yet proves multiple conspiracies at trial, a material variance results and the defendants are each entitled to a new trial if they can show *that their substantial rights were affected by the variance. See, e. g., United States v. Elliott, supra,* at 900. If, however, the government indicts several defendants under multiple conspiracy counts (or alleges facts in the indictment that amount to multiple conspiracies) and the district court nevertheless refuses to sever the trial, the defendants are each entitled to a new trial *without any showing of prejudice,* for misjoinder under Rule 8(b) is inherently prejudicial. *See, e. g., United States v. Lane,* 584 F.2d 60, 62 (5th Cir. 1978); *United States v. Levine,* 546 F.2d 658, 662 (5th Cir. 1977); J. Moore, *supra,* at ¶ 8.04[2]. The end result of the separate development of these two lines of authority—one under variance doctrine and the other under Rule 8(b)—means that the trial of multi-

ple conspiracies is treated differently on appeal depending on whether the government fails to introduce evidence of a single conspiracy at trial (*i. e.,* a variance, requiring reversal if substantial rights are affected) or instead fails in the indictment to allege facts sufficient to constitute a single conspiracy (*i. e.,* a misjoinder under Rule 8(b), requiring reversal in all cases).

As difficult as this anomaly may be to justify, we have no choice but to continue to follow it. In *Schaffer v. United States,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960), the Supreme Court held that the propriety of joinder under Rule 8(b) is to be judged according to the language of the indictment, not according to the government's proof at trial. So long as the indictment alleges facts that amount to a single conspiracy, it matters not—as far as Rule 8(b) is concerned—that the government fails to introduce at trial any proof of a single conspiracy. *See* J. Moore, *supra,* at ¶ 8.06[3]. Limited exceptions to this rule have been found to exist (1) where the prosecution is shown to have acted in bad faith, and (2) where the government's indictment under a single count was from the outset based on an improper interpretation of the law. Absent one of these exceptions, however, "allegations of an indictment will be accepted as true in deciding a Rule 8(b) motion." *United States v. Levine, supra,* at 663. *See United States v. Salinas,* 601 F.2d 1279, 1292 (5th Cir. 1979); *United States v. Nims,* 524 F.2d 123, 126 (5th Cir. 1975), *cert. denied,* 426 U.S. 934, 96 S.Ct. 2646, 49 L.Ed.2d 385 (1976).

pendent nature of the criminal enterprise is such that each conspirator had to have realized that it extended beyond his individual role. This form of conspiracy is often described as a "chain" rather than a "wheel." Since the success of the criminal scheme depends on the success of each link in the chain, "[a]n individual associating himself with a 'chain' conspiracy knows that it has a 'scope' and that for its success it requires an organization wider than may be disclosed by his personal participation." *United States v. Elliott, supra,* at 901, *quoting United States v. Agueci,* 310 F.2d 817, 827 (2d Cir. 1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). The government does not contend that the case at bar is a "chain" conspiracy, and the evidence does not suggest one. Indeed, a chain conspiracy would be difficult to imagine on the facts of this case: while two people may in fact conspire together to bribe a single judge, there is no reason why one who has individually so acted must necessarily have assumed that others have also bribed the same judge.

■ The government does not defend its joint trial in this case on the basis of traditional conspiracy law, *i. e.,* by arguing either that the evidence connected the spokes of a wheel conspiracy by common knowledge or agreement, or that the evidence demonstrates a chain conspiracy. Instead, the government argues that despite the apparent relevance to this case of the traditional multiple conspiracy doctrine, the defendants were properly tried together for a single "enterprise conspiracy" under RICO. The government contends, in brief, that a single conspiracy to violate a substantive RICO provision may be comprised of a pattern of agreements that absent RICO would constitute multiple conspiracies. The government contends that this is so even where, as here, there is no agreement of any kind between the members of the two separate conspiracies. According to the government, these otherwise multiple conspiracies are tied together by the RICO "enterprise:" so long as the object of each conspiracy is participation in the same enterprise in violation of RICO, it matters not that the different conspiracies are other-

wise unrelated. Thus, the government argues that it need not demonstrate any connection between Walker and Maynard because the two conspiracies at issue each involved the same RICO enterprise—the Municipal Court of the City of El Paso.

For this proposition the government relies on *United States v. Elliott,* 571 F.2d 880 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). We held in *Elliott* that a group of defendants who could not have been tried for a single conspiracy to violate any particular predicate crime could nevertheless be tried for a single conspiracy to violate RICO. *Elliott* involved six defendants who had committed a variety of unrelated offenses with no common purpose or agreement as to any of the various crimes. We explained:

> Applying pre-RICO concepts to the facts of this case, we doubt that a single conspiracy could be demonstrated. Foster had no contact with Delph and Taylor during the life of the alleged conspiracy. Delph and Taylor, so far as the evidence revealed, had no contact with Recea Hawkins. The activities allegedly embraced by the illegal agreement in this case are simply too diverse [unrelated acts involving arson, murder, theft, drugs, and obstruction of justice] to be tied together on the theory that participation in one activity necessarily implied awareness of others.

571 F.2d at 902. Despite these facts, we upheld the government's joint trial of the *Elliott* defendants on a single conspiracy count. We defined the RICO enterprise in *Elliott* to consist of at least five persons who joined together to commit crime for profit—"a myriopod criminal network, loosely connected but connected nonetheless." 571 F.2d at 899. Since the defendants had conspired together to participate in that enterprise through a pattern of racketeering activity, we upheld their joint trial despite the absence of an agreement as to any particular predicate crime. We held, in short, that "[RICO's] effect in this case is to free the government from the strictures of the multiple conspiracy doctrine and to allow the joint trial of many persons ac-

cused of diversified crimes." 571 F.2d at 900.

Read out of context, without attention to the facts of the case or to the court's rationale, *Elliott* does seem to support the government's position—*i. e.*, that the defendants' participation in the same RICO enterprise is enough to tie otherwise multiple conspiracies together even where, as here, there is no agreement of any kind between the members of the two separate conspiracies.[7] Indeed, *Elliott* has been thus read by some courts and commentators (and, as so read, has been uniformly criticized). *See United States v. Zemek*, 634 F.2d 1159, 1169 n.12 (9th Cir. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981); *United States v. Boffa*, 513 F.Supp. 444, 471–75 (D.Del.1980); *United States v. Cryan*, 490 F.Supp. 1234, 1239, 1242–44 (D.N.J.), *affirmed without opinion*, 636 F.2d 1211 (3d Cir. 1980); C. Bradley, "Racketeers, Congress, and the Courts: An Analysis of RICO," 65 Iowa L.Rev. 837, 876–79 (1980); Note, "*Elliott v. United States*: Conspiracy Law and the Judicial Pursuit of Organized Crime through RICO," 65 Va.L.Rev. 109 (1979).

To put the *Elliott* holding in its proper perspective, we quote our explanation of that holding at length:

> Under the general federal conspiracy statute, "the precise nature and extent of the conspiracy must be determined by reference to the agreement which embraces and defines its objects. Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes." *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 102, 87 L.Ed. 23 (1942). In the context of organized crime, this principle inhibited mass prose-

cutions because a single agreement or "common objective" cannot be inferred from the commission of highly diverse crimes by apparently unrelated individuals. *RICO helps to eliminate this problem by creating a substantive offense which ties together these diverse parties and crimes.* Thus, the object of RICO conspiracy is to violate a substantive RICO provision—here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity—and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity. The gravamen of the conspiracy charge in this case is not that each defendant agreed to commit arson, to steal goods from interstate commerce, to obstruct justice, and to sell narcotics; rather, it is that each agreed to participate, directly and indirectly, in the affairs of the enterprise by committing two or more predicate crimes. Under the statute, it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs. *To find a single conspiracy, we still must look for agreement on an overall objective. What Congress did was to define that objective through the substantive provisions of the Act.*

571 F.2d at 902–03 (emphasis added; footnote omitted).

*Elliott* does indeed hold that on the facts of that case a series of agreements that under pre-RICO law would constitute multiple conspiracies could under RICO be tried as a single "enterprise" conspiracy. But the language of *Elliott* explains that what ties these conspiracies together is not the mere fact that they involve the same enter-

---

**7.** The government's interpretation rests on some admittedly broad language in *Elliott* that suggests that RICO was intended to alter traditional conspiracy concepts. For example, we stated in *Elliott* that

> through RICO, Congress intended to authorize the single prosecution of a multi-faceted, diversified conspiracy by replacing the inadequate "wheel" and "chain" rationales with a new statutory concept: the enterprise.

571 F.2d at 902. This and similar statements must, however, be read in the context of the balance of the opinion. In context, as discussed below, this language suggests not that the Congress sought in RICO to change traditional conspiracy concepts, but that the Congress sought instead to expand the reach of traditional conspiracy charges by establishing a new substantive crime around which a conspiracy might center.

prise, but is instead—as in any other conspiracy—an "agreement on an overall objective." What RICO does is to provide a new criminal objective by defining a new substantive crime. In *Elliott*, as here, that crime consists of participation in an enterprise through a pattern of racketeering activity. The defendants in *Elliott* could not have been tried on a single conspiracy count under pre-RICO law because the defendants had not agreed to commit any particular crime. They were properly tried together under RICO only because the evidence established an agreement to commit a substantive RICO offense, *i. e.*, an agreement to participate in an enterprise through a pattern of racketeering activity.

To be sure, the government did not prove in *Elliott* that each of the conspirators had explicitly agreed with all of the others to violate the substantive RICO provision at issue. However, the government did prove that, as in a traditional "chain" conspiracy, the nature of the scheme was such that each defendant must necessarily have known that others were also conspiring to participate in the same enterprise through a pattern of racketeering activity. We found the facts sufficient to demonstrate that the defendants knew they were "directly involved in an enterprise whose purpose was to profit from crime," and that each knew "that the enterprise was bigger than his role in it, and that others unknown to him were participating in its affairs." 571 F.2d at 904 & n.30. The agreement among all of the defendants in *Elliott* was an implicit one, but it was an agreement nonetheless.

This reading of the *Elliott* holding is supported by two more recent decisions of our court. In the first case, *United States v. Bright*, 630 F.2d 804, 834–35 (5th Cir. 1980), we considered the validity of a single conspiracy indictment under RICO on facts similar to those now before us. The *Bright* conspiracy centered around the sheriff of DeSoto County, Mississippi, who was accused of conspiring with nine other persons to accept bribes in the conduct of his office. We found the evidence sufficient to support

each defendant's conspiracy conviction, but found that one of the defendants with whom the sheriff had conspired (Bright) had not agreed in any way with the other eight defendants, and that consequently the government's proof had created a material variance with the indictment.[8] In essence, the government had indicted the defendants on a single conspiracy count, but the government's evidence had established two separate conspiracies: one between Bright and the sheriff, and the other among the remaining eight defendants and the sheriff.

Our treatment of this variance in *Bright* suggests, as does *Elliott*, that the factor that allows what otherwise would constitute multiple conspiracies to be tried together as one RICO conspiracy is a common agreement to commit the substantive RICO offense. We explained:

> We are aware that the enterprise conspiracy is designed to avoid the pitfalls of traditional conspiracy law which results in a criminal enterprise being viewed as several small conspiracies rather than one large conspiracy because of different goals and different participants. However, we are also cognizant of the fact that the RICO conspiracy crime still requires an agreement.

630 F.2d at 834 n.52 (citation omitted). What underlay this portion of our decision in *Bright*, therefore, was the importance of the actual agreement among the parties. The mere fact that Bright had conspired to violate RICO as to the same enterprise as was involved in the other established conspiracy—and had even conspired with a common "hub," the sheriff—was insufficient justification for a joint trial of the two multiple conspiracies. What was necessary to constitute a single conspiracy was, as in *Elliott*, an agreement among *all* of the conspirators.

A second recent case involving a multiple conspiracy question in the RICO context is *United States v. Stratton*, 649 F.2d 1066 (5th Cir. 1981). The defendants in *Stratton* argued, in brief, that the government had

---

**8.** Although we found a material variance in *Bright*, we held that the variance did not affect the substantial rights of the defendants, and we

therefore affirmed the convictions. 630 F.2d at 834–35.

"improperly charged multiple conspiracies under the guise of a single conspiracy" by defining the RICO enterprise (Florida's Third Judicial Circuit) too broadly. *Id.*, at 1074. As in the case at bar, the conspiracy alleged in *Stratton* involved the bribery of a state judge; and, as in this case, the defendants argued that each agreement to bribe the judge was a separate conspiracy. Since "some coconspirators had no knowledge of all the illicit agreements," the defendants contended that they could not all be tried in a single conspiracy count. *Id.* We declined specifically to reach this argument because the facts of the case undermined the basis of the defendants' position:

> [T]he bribery and other illegal agreements were part of a single overall scheme, and . . . the leading characters in the conspiracy knew of the others' illegal activities, and, indeed, conspired with one another in furtherance of the illegal activities of the enterprise.

*Id.*, at 1073 n.8. In short, all of the defendants in *Stratton* had conspired together to commit a substantive RICO offense—to participate in the conduct of an enterprise (Florida's Third Judicial Circuit) through a pattern of racketeering activity (largely bribery). *Id.*, at 1074–75.

Although *Stratton* did not, therefore, decide whether the government could combine "totally unrelated agreements and overt acts in a single [RICO] conspiracy," we did express serious doubt as to the propriety of such a joinder. Taken to its logical extreme, a rule allowing the joint trial of otherwise unrelated conspiracies solely on the basis of their relationship to a common enterprise—the rule which the government advocates in this case—leads to ridiculous results:

> For example, assuming that our own court—the United States Court of Appeals for the Fifth Circuit—was alleged to be the enterprise (as we assume would be proper under our analysis), we question whether an agreement to bribe a court official in El Paso, Texas could be part of the same conspiracy as an unrelated agreement to use a judicial office for illicit profit-making purposes in Fort Lauderdale, Florida, when neither the El Paso nor the Fort Lauderdale conspirators knew of the existence of the other group.

*Id.*, at 1073 n.8. This extreme hypothetical problem is not fundamentally different from the case now before us. Although both conspiracies in the case at bar involved the same judge, it is not that fact which the government argues ties the two conspiracies together. Rather, it is each conspiracy's relationship to the same enterprise (the Municipal Court of the City of El Paso) that is said to provide the necessary link. Thus, the theory urged by the government would bring together individual conspiracies to bribe different judges on the same court.

Our review of *Elliott*, along with *Bright* and *Stratton*, convinces us that the government has read this authority too broadly. *Elliott* does not stand for the proposition that multiple conspiracies may be tried on a single "enterprise conspiracy" count under RICO merely because the various conspiracies involve the same enterprise. What *Elliott* does state is two-fold: (1) a pattern of agreements that absent RICO would constitute multiple conspiracies may be joined under a single RICO conspiracy count if the defendants have agreed to commit a substantive RICO offense; and (2) such an agreement to violate RICO may, as in the case of a traditional "chain" or "wheel" conspiracy, be established on circumstantial evidence, *i. e.*, evidence that the nature of the conspiracy is such that each defendant must necessarily have known that others were also conspiring to violate RICO.

In this case the government has not attempted to prove that Walker and Maynard agreed with each other to participate in a bribery scheme with Sutherland, nor has it contended that the nature of each defendant's agreement with Sutherland was such that he or she must necessarily have known that others were also conspiring to commit racketeering offenses in the conduct of the Municipal Court. We must conclude, therefore, that the multiple conspiracy doctrine precluded the joint trial of the two multiple conspiracies involved in this case on a single RICO conspiracy count. In accordance with *Kotteakos* and its progeny, we must reverse

the defendants' convictions if this error affected their substantial rights.

### B. The Prejudicial Effect of the Variance in this Case

■ We turn next to a consideration of prejudicial effect of the variance involved in this case. As we note above, a variance is fatal only if it affects the substantial rights of the defendants.[9]

■ Any analysis of the prejudicial effect of a variance between the government's indictment on a single conspiracy count and its proof of multiple conspiracies must begin with the Supreme Court's two seminal cases on this question—*Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), and *Kotteakos v. United States, supra*. *Berger* announced the rule that such a variance is fatal only if it has affected the substantial rights of the accused, 295 U.S. at 81–82, 55 S.Ct. at 630–631, and went on to find no such effect on the facts of that case. The conspiracy charged by the government in *Berger* consisted of four persons who were alleged to have agreed together to utter counterfeit federal reserve notes; what the government proved at trial was the existence of two separate conspiracies, one consisting of two of the defendants and the other consisting of three of the defendants, with one defendant common to both agreements. The Court rested its analysis in *Berger* on the reasons that underlie the prohibition of material variances:

> The general rule that allegations and proof must correspond is based upon the obvious requirements (1) that the accused shall be definitely informed as to the charges against him, so that he may be enabled to present his defense and not be taken by surprise by the evidence offered at the trial; and (2) that he may be protected against another prosecution for the same offense.

295 U.S. at 82, 55 S.Ct. at 631. Because nothing in the record suggested that the

defendants had been prejudiced in either respect by their joinder, the Court concluded that their substantial rights had not been affected. 295 U.S. at 83, 55 S.Ct. at 631.

In *Kotteakos*, by contrast, the Court did find that the defendants had been sufficiently prejudiced to justify reversal. In reaching this decision, the Court emphasized the size and complexity of the *Kotteakos* conspiracies:

> On the face of things it is one thing to hold harmless the admission of evidence which took place in the *Berger* case, where only two conspiracies involving four persons all told were proved, and an entirely different thing to apply the same rule where, as here, only one conspiracy was charged, but eight separate ones were proved, involving at the outset thirty-two defendants.

328 U.S. at 766, 66 S.Ct. at 1248–49. It was this fact that made the joint trial in *Kotteakos* so serious an error and distinguished it from *Berger*: "The sheer difference in numbers, both of defendants and of conspiracies proven, distinguishes the situation." *Id.* This does not mean, however, that the proper analysis should hinge on numbers alone. A more fundamental distinction between *Kotteakos* and *Berger* can be found in the Court's treatment in *Kotteakos* of the reasons for the prohibition of material variances. When the government tries multiple conspiracies under a single count, an important right is at stake in addition to those cited in *Berger*: "the right not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others." 328 U.S. at 775, 66 S.Ct. at 1252–53. Prejudice inhered in the *Kotteakos* trial not because of the number of defendants or conspiracies *per se*, but because of "[t]he dangers of transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise . . . ." 328 U. S. at 774, 66 S.Ct. at 1252.[10]

9. This standard, and the discussion that follows, is premised on the assumption that the multiple conspiracy doctrine should be treated as a "variance" question rather than a Rule 8(b) "misjoinder" question. The distinction is crucial in this case, since prejudice is presumed

to follow from misjoinder but not from a variance. *See* note 6 *supra*.

10. This additional reason for the Court's holding in *Kotteakos* puts the multiple conspiracy doctrine in a category apart from other forms

The crucial question before us, therefore, is whether the defendants were substantially prejudiced by the inherent "transference of guilt" that was the focus of *Kotteakos*.[11] Our review of the record convinces us that for several reasons the defendants were *not* so prejudiced. We need not decide whether any one of these reasons would be sufficient to compel such a result; but taken together, the following facts lead us to the conclusion that the defendants' substantial rights were not affected.

First, the number of conspiracies (two) and defendants (three) is small—even more so than in *Berger*. This is not to say that such cases may always be tried together without substantial prejudice to the defendants, but we do think that the danger implicit in the jury's confusion of different defendants and offenses and of the evidence related to each is diminished by the simpler pattern of events involved in a smaller trial.

Second, the evidence as to each conspiracy was clearly distinct. Kalastro's testimony involved only the Walker-Sutherland conspiracy, and the Maynard conversations involved only the Maynard-Sutherland conspiracy. In neither case did the evidence directly implicate the other conspiracy or specifically contradict any portion of the defense as to the other conspiracy. Moreover, the government conceded at trial the independence of these conspiracies, and did not seek to link the evidence on each one to the other. This does not mean that the defendants' joinder in a single trial with evidence of each conspiracy was harmless, for proof at trial of a similar conspiracy to bribe the same judge obviously makes any hypothesis of innocence more difficult to accept. Still we must conclude that prejudice is more difficult to establish where, as here, the evidence as to each conspiracy is so distinct as to render confusion between the different defendants and conspiracies unlikely.

Third, and most importantly, the government introduced overwhelming evidence of guilt as to all three defendants, and this evidence would have been admissible in two separate trials on individual conspiracy counts. With respect to the Walker-Sutherland conspiracy, the government had Kalastro's testimony as to Walker's meetings with Sutherland, her handing to Sutherland of tickets and cash, and her confession of the bribery scheme. With respect to the Maynard-Sutherland conspiracy, the government had the Maynard conversations in which Maynard agreed to "take care of" or "fix" a number of tickets for persons cooperating with the investigation, and in which Maynard appeared to contact Sutherland for his help. We recognize that this evidence, taken alone, allows for plausible hypotheses of innocence: (1) Walker and Sutherland could argue that Kalastro had lied, and these defendants did in fact introduce substantial impeachment evidence; and (2) Maynard and Sutherland could argue that despite the content of the Maynard conversations, Maynard had actually given his collected traffic tickets to an attorney or otherwise legally disposed of them. However, these hypotheses are rendered implausible—indeed, wholly incredible—by the government's additional evidence. As explained in Part II of this opinion, the government's evidence shows that a number of individual tickets that were collected by Walker and Maynard and favorably disposed of by Sutherland were handled through extraordinarily irregular procedures. By and large, these tickets found their way into Sutherland's court without the help of the Traffic Violations Bureau and without the usual formal complaints; Sutherland asked his clerks not to discuss these irregular procedures in public, paid them out of his own pocket for their extra work, and halted such procedures

---

of variances. Although it does not bring the doctrine within the purview of Rule 8(b) misjoinder rules, it does implicate misjoinder concerns in addition to those involved in traditional variance analysis. *See* note 6 *supra*.

11. The defendants do not contend that they were prejudiced in terms of either traditional variance concern, *i. e.*, that they either were not adequately informed of the charges against them or that they were not adequately protected against future prosecution for the same offense.

when he learned he was under investigation. This evidence—which would have been admissible in each of two separate trials on the multiple conspiracies involved in this case—most certainly obscured the importance of any potential "transference of guilt" between the two conspiracies. This fact, when considered along with the additional factors discussed above, convinces us that the defendants' substantial rights were not affected by their joinder under a single conspiracy count and that, accordingly, their convictions need not be reversed for variance.

## IV. THE INDICTMENT

### A. Specificity

Sutherland and Maynard each argue that the indictment was insufficient because it did not state the alleged offense with adequate specificity. In particular, they point to the failure of the indictment (1) to state the specific places at which the various acts occurred, (2) to state the specific times at which the various acts occurred and, (3) specifically to set forth the state statute that prohibits the acts of bribery alleged in the indictment.

■ An indictment is not insufficient merely because some necessary allegation was stated with less specificity than might have been used. The sufficiency of an indictment is determined by practical, not technical, considerations. An indictment is adequate so long as it

> sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction.

*Hagner v. United States*, 285 U.S. 427, 431, 52 S.Ct. 417, 419, 76 L.Ed. 861 (1932), *quoting Cochran and Sayre v. United States*, 157

U.S. 286, 290, 15 S.Ct. 628, 630, 39 L.Ed. 704 (1895). *See e. g., United States v. Gallipoli*, 599 F.2d 100, 103 (5th Cir. 1979); *United States v. Guthartz*, 573 F.2d 225, 227 (5th Cir.), *cert. denied*, 439 U.S. 864, 99 S.Ct. 187, 58 L.Ed.2d 173 (1978); *United States v. Miranda*, 494 F.2d 783, 788 (5th Cir.), *cert. denied*, 419 U.S. 966, 95 S.Ct. 228, 42 L.Ed.2d 181 (1974).

■ In this case the indictment clearly states the offense charged with sufficient specificity. The acts are alleged to have occurred in the Western District of Texas, and are said to have consisted of a number of bribes that occurred between November 1975 and January 1980. Although the indictment does not quote the Texas bribery statute at issue here, *see* note 3 *supra*, it sufficiently tracks the language of that statute and in fact cites the statute, thus leaving no doubt as to the nature of the "racketeering activity" alleged in the indictment.[12] Moreover, the defendants have not alleged that they were actually disadvantaged by the indictment's purportedly inadequate charge; in the absence of any likely prejudice to the defendants, a failure to set forth more specifically the allegations in the indictment is not reversible error. *See United States v. Arteaga-Limones*, 529 F.2d 1183, 1188–89 (5th Cir.), *cert. denied*, 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d 286 (1976).

### B. Variance

■ In addition to their assertion of the multiple conspiracy doctrine, *see* Part III of this opinion, the defendants argue that the government's proof at trial varied from the indictment in several other respects so greatly as to justify a reversal. In the first place, Sutherland points to the government's misleading use of the terms "fine" and "verdict" in the indictment. Sutherland argues that the indictment's charge that Maynard and Walker "collect[ed] the

---

12. The indictment specifically charged the defendants with conspiracy to commit "a violation of Title 18, United States Code, Section 1962(c), *involving Section 36.02, Texas Penal Code.*" (Emphasis added.) The indictment alleged that pursuant to the conspiracy Walker and Maynard would collect traffic citations from friends and associates "to be disposed of"

by Sutherland in his official capacity as judge of the Municipal Court; the indictment further alleged that Sutherland accepted cash bribes "for the purpose of influencing his official behavior," and that such bribes consisted of the amount of the fine plus $10, the total to be divided between Sutherland and whoever had collected and delivered the ticket.

amount of the fine" and delivered it to Sutherland "for the purpose of dismissing the offense or entering a verdict of not guilty" amounts at most to an accusation of embezzlement, not of bribery. This conclusion follows, argues Sutherland, from the usual definitions of "fine" and "verdict," since the former refers to a monetary punishment assessed at the *conclusion* of criminal proceedings and the latter refers to a decision made, after a trial, by the *jury*. We disagree. As we note above in Part IVA of this opinion, an indictment should not be read with technical precision; instead, an indictment must be read fairly and in its entirety. Thus read, the indictment in this case undoubtedly accuses Sutherland of receiving something of value for the purpose of influencing his official behavior—in other words, of accepting bribery within the meaning of applicable state law.

In the second place, each of the defendants argues that the government's proof at trial varied from the indictment's allegations as to the RICO "enterprise" at issue. The defendants note that the indictment charges that the enterprise is the Municipal Court of the City of El Paso, while the government's evidence at trial establishes that the Municipal Court was not a separate entity from the City of El Paso, and that the interstate purchases necessary to create federal jurisdiction were made by the city, not the court. These distinctions do not, however, constitute a material variance. First, the term "enterprise," as defined in 18 U.S.C. § 1961(4), *supra* at note 1, is broad enough to include a municipal court which is one part of the city government. *See United States v. Stratton*, 649 F.2d 1066 at 1074–75 (5th Cir. 1981). Second, the government did not contend at trial that the city, rather than the court, was the relevant "enterprise." Rather, the government used the city's interstate purchases to establish the effect of the *court* on interstate commerce; since the fines assessed by the *court* were paid into the city's general revenue funds, the evidence established that the city's interstate purchases were in part financed out of funds collected by the Municipal Court.

In the third place, Walker argues that certain alleged instances of bribery were raised by the government's proof at trial despite their absence from the indictment. Assuming that this is so, we still cannot say that such variance entitles Walker to a reversal of her conviction. As we note in Part III of this opinion, a variance between the indictment and the government's evidence is fatal to the government's case only if substantial rights of the defendant are affected. Walker has not suggested how such variance could have affected her defense, and in light of the large number of alleged instances involved we fail to perceive any prejudice from the relatively small number of traffic tickets involved in this purported variance.

## V. EVIDENTIARY RULINGS

### A. Extrinsic Evidence of a Witness' Prior Conduct

Sutherland and Walker each challenge the district court's exclusion of certain testimony of Nancy Forbus, a former friend and co-worker of Sally Kalastro, a key government witness. Forbus was prepared to testify that Kalastro had admitted to her that Kalastro had embezzled funds from their employer. This testimony had two conceivable purposes: (1) to demonstrate Kalastro's prejudice against Walker, who (according to the defendants) had discovered the alleged embezzlement and led their employer to fire Kalastro; and (2) to demonstrate Kalastro's character for truthfulness or untruthfulness, since Kalastro had denied the embezzlement on cross-examination.

The admissibility of this testimony is governed by Federal Rule of Evidence 608(b). That rule allows for extrinsic evidence of specific instances of the conduct of a witness only if the evidence is probative of the witness' character for truthfulness or untruthfulness, not to demonstrate bias or prejudice on the part of the witness. And, if the testimony is indeed relevant to the witness' veracity, it is then admissible only in the discretion of the court.

In this case the testimony arguably was offered for a purpose contemplated by Rule

608(b), but under the circumstances the district court did not abuse its discretion in refusing to admit it. The testimony was also offered at least in part for a purpose not contemplated by Rule 608(b) (*i. e.*, to demonstrate prejudice), and was merely cumulative evidence both as to that purpose and as to its legitimate purpose (*i. e.*, to demonstrate a character for untruthfulness).[13] Therefore the court did not err when it excluded this testimony.

### B. Coconspirator Hearsay

■ The district court admitted three series of coconspirator hearsay statements. The first consisted of statements made by Sutherland to the Municipal Court clerk regarding plea practices; when introduced, the court instructed the jury that it could consider the statements only against Sutherland. The second series consisted of statements made by Walker to Kalastro, in which Walker admitted and described the ticket-fixing scheme; after a hearing on the nature of the conspiracy, the court instructed the jury that these statements could be considered only against Walker and Sutherland, not against Maynard. The third series consisted of taped conversations between Maynard and certain individuals who posed as persons seeking help on traffic tickets each had received; when the tapes were admitted, the court instructed the jury that the statements contained therein could be considered only against Maynard, not against either Sutherland or Walker. Despite these limiting instructions, the court explained to the jury at the close of the government's case that they could properly "consider those [hearsay] statements with respect to all of the defendants in this case." Trial Transcript at 1124. In its charge to the jury at the conclusion of the trial, the court instructed the jury that coconspirator hearsay statements could be considered against a defendant if "it is established beyond a reasonable doubt, first, that a conspiracy existed and,

second, from evidence of his own acts and statements, that the defendant was one of its members." Trial Transcript at 1497.

Sutherland argues that neither the statements by Walker nor the statements by Maynard could have been used against him. Sutherland recognizes that coconspirator hearsay is admissible under Federal Rule of Evidence 801(d)(2)(E), but contends that the government failed to make a "sufficient showing, by independent evidence, of a conspiracy" between Sutherland and either Walker or Maynard, as required by our decision in *United States v. James*, 590 F.2d 575, 580–81 (5th Cir.) (*en banc*), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). We disagree. Sufficient independent evidence of conspiracy was introduced with regard to both other defendants. As to Walker, the government introduced testimony to the effect that Sutherland visited Walker's office once or twice a week during the time of the events in question, and that on one such occasion Sutherland was observed taking a stack of traffic tickets and money from Walker. As to Maynard, the government introduced evidence to the effect that seventy-eight telephone calls were made, during the time of the events in question, between Maynard's and Sutherland's phones. In each case, the government proved that a significant number of specific tickets was collected by the coconspirator and later disposed of favorably through irregular proceedings in Sutherland's court. The government need not prove a conspiracy by a preponderance of the evidence in order to admit coconspirator hearsay statements, but need only introduce "substantial, independent evidence of a conspiracy at least enough to take the question to the jury." *James, supra*, at 581, *quoting United States v. Nixon*, 418 U.S. 683, 701, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974). Under this standard, the government clearly introduced sufficient evidence of conspiracies both between Walker and Sutherland and between Maynard and Sutherland.[14]

---

**13.** Forbus also testified that Kalastro hated Walker because Walker had been responsible for Kalastro being fired; that Kalastro wanted to "get even" with Walker; and that Kalastro's reputation for truth and veracity was "very, very bad."

**14.** Sutherland also claims that the district court failed to follow the procedure required by *United States v. James, supra*, 590 F.2d at 582, at the end of the trial. In particular, *James* requires the court, "on appropriate motion at the conclusion of all the evidence," to make a fac-

Walker and Maynard argue that their hearsay statements could not properly be used against each other, and that consequently the district court erroneously instructed the jury that it could so consider this evidence. We agree that the court's brief instruction at the conclusion of the government's case was erroneous, for in that instruction the court allowed the jury to consider coconspirator hearsay as to all defendants despite the failure of the government to introduce any evidence of a conspiracy between Walker and Maynard. We also agree that the court's final charge to the jury was erroneous, for it allowed the jury to decide the admissibility of coconspirator hearsay—a task that undoubtedly belongs to the court. *United States v. James*, 590 F.2d at 578–80. However, it follows from our discussion in Part IIIB of this opinion that these errors did not affect the substantial rights of the defendants and are therefore not grounds for reversal. The pattern of agreements and the evidence introduced by the government was not confusing; the hearsay evidence did not directly implicate the participants in the conspiracy as to which it was not properly introduced; and the evidence properly introduced as to each conspiracy was overwhelming. On this basis we conclude that the district court's erroneous instructions on coconspirator hearsay are not reversible error.

### C. Audio Tapes of the Maynard Conversations

The government introduced a series of audio tapes of conversations between Maynard and certain individuals who posed as persons seeking help on traffic tickets each had received. All three defendants now raise a variety of challenges to the district court's admission of these tapes, and also challenge the court's allowance of transcripts of the taped conversations.

In the first place, Sutherland argues that the government did not lay a proper foundation for its introduction of the tapes, as required by our decision in *United States v. Biggins*, 551 F.2d 64, 66–67 (5th Cir.1977). Our examination of the record convinces us that this is not so. The government introduced the testimony of Terry Youngblood, an F.B.I. agent, and of Edward Ortega, an El Paso policeman, who together supervised the audio tapings at issue; both Youngblood and Ortega testified at some length as to the *Biggins* requisites. Transcript at 632–41; 830–41. Sutherland states in particular that Maynard was not identified as a speaker on the tapes. This also is not so. Transcript at 840–41.

In the second place, all of the defendants complain that the tapes were only partially audible. The record in this case does indicate that the tapes were of poor quality and often unintelligible, but that fact alone does not render them inadmissible. Recordings must be excluded only if the inaudible or unintelligible portions "are so substantial as to render the recording as a whole untrustworthy," and that determination "is left to the sound discretion of the trial judge." *United States v. Mendoza*, 574 F.2d 1373, 1378 (5th Cir.), *cert. denied*, 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978), *quoting United States v. Avila*, 443 F.2d 792, 795–96 (5th Cir.), *cert. denied*, 404 U.S. 944, 92 S.Ct. 295, 30 L.Ed.2d 258 (1971). We perceive no abuse of discretion in this case.

In the third place, the defendants challenge the court's submission to the jury of the government's written transcript of the tapes.[15] The defendants argue, in

tual finding as to the existence and scope of the conspiracy. Sutherland made no such motion and we therefore decline to reach this argument.

15. The government contends that the transcripts were not evidence at all, but were merely "aids" given to the jury to help them follow the tapes. We disagree. As we explained in *United States v. Onori*, 535 F.2d 938, 947 (5th Cir.1976), "the use of a transcript as a guide is analogous to the use of expert testimony as a device aiding a jury in understanding other types of real evidence." In short, a transcript is evidence of what is recorded on an audio tape, just as the tape is evidence of what was said in the original conversation.

The government notes that the transcripts were not submitted to the jury, along with other evidence, for their consideration during deliberations. We fail to perceive, however, why this means that the transcripts were not "evidence." The government has cited no authority, and we have found none, to support the

brief, that the government failed to authenticate the transcript in accordance with *United States v. Rochan,* 563 F.2d 1246, 1250–52 (5th Cir.1977) and *United States v. Onori,* 535 F.2d 938, 946–49 (5th Cir.1976). We agree that the government failed adequately to authenticate the transcripts. First, the government introduced no testimony that the transcripts were accurate reproductions of the taped conversations. Second, the government introduced no testimony as to the accuracy of the government's translation of certain Spanish portions of the conversations. Testimony on both of these counts is necessary for proper authentication, for the proponent who seeks to introduce written transcripts of audio tapes must introduce "some evidence that the transcripts are accurate—that the words are accurately reproduced and the voices accurately identified." *United States v. Rochan,* 563 F.2d at 1251. Moreover, it follows from this general rule that when the transcript contains a translation into English of conversations spoken in a foreign language, the proponent must introduce the testimony of a qualified witness to authenticate and verify the translation. *See United States v. Llinas,* 603 F.2d 506, 509 n.3, 510 (5th Cir.1979), *cert. denied,* 444 U.S. 1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980).

In this case, however, we cannot find that the district court committed a reversible error in admitting the transcripts, for the context in which they were used makes it clear that no substantial right of the defendants was affected by the government's failure adequately to authenticate the tran-

scripts. Our conclusion rests on the government's introduction of the testimony of two of the three persons who participated in the taped conversations with Maynard. These witnesses did not specifically testify as to the accuracy of the transcribed translations, but they did testify in detail as to the content of the subject conversations. In each case the witness' testimony spells out a conversation or series of conversations in which she makes a deal with Maynard pursuant to which she pays him to "take care of" or to "fix" several traffic tickets—essentially the same conversation as transcribed off the tapes by the government. Thus, although the government did not verify the accuracy of the transcripts, it did introduce independent evidence of the content of two out of the three subject conversations. In this context it is clear that the defendants were not prejudiced by the government's failure to verify the accuracy of their transcriptions.[16]

■ In the fourth place, Sutherland challenges the district court's admission of one of the taped conversations on the basis that the necessary consent for the recording was not properly established. The consenting participant on that tape was Beatrice Rede, who was hospitalized at the time of trial. The government introduced the testimony of F.B.I. agent Youngblood as to Rede's consent, and Sutherland objected that the consent testimony was hearsay. Because of Rede's obvious unavailability as a witness, however, such hearsay was certainly admissible under Federal Rule of Evidence 804(a)(4) and (b)(5).

proposition that inadmissible evidence, *e. g.,* an unauthenticated transcript, may be shown to the jury so long as it is not used during deliberations. In fact, such a rule would seem contrary to Fed.R.Evid. 103(c), which reads as follows:

> In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury.

**16.** In so holding we do not rely on the government's argument that the defendants were not prejudiced because they had the opportunity to challenge the accuracy of the transcripts.

Once a transcript is properly admitted, it is true that—as with any other evidence—the proponent has no special burden to prove its accuracy, and that, accordingly, its opponent may fail to challenge such accuracy only at his peril. *See United States v. Onori, supra,* at 949. Still, however, the proponent must meet the minimal burden of authentication before the transcript can be admitted. That burden cannot be satisfied (or its failure rendered harmless) merely because the opponent did not challenge its accuracy. In short, an opponent's failure to challenge the *weight* of the evidence does not cure the proponent's failure to establish the *admissibility* of the evidence.

## VI. THE CHARGE

■ The first and largest group of the defendants' challenges to the district court's instructions to the jury concerns the court's handling of the multiple conspiracy problem. In particular, Sutherland and Walker each argue that the district court erroneously refused to give any one of a number of instructions that would have required the jury to acquit all three defendants if they found that the evidence established multiple conspiracies despite the indictment's charge of a single conspiracy. We disagree. While some instruction regarding multiple conspiracies may have been appropriate, *see* note 5 *supra*, the defendants clearly were not entitled to the instructions requested, each of which required a verdict of acquittal merely because of the government's proof of multiple conspiracies in variance with the indictment. *See, e. g., United States v. Ashley,* 555 F.2d 462, 467–68 (5th Cir.), *cert. denied,* 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977).

■ In the second place, Sutherland and Maynard each argue that the court erroneously omitted an oral charge stating each overt act alleged in the indictment. Rather than listing each of the many specific instances charged in the indictment, the court instructed the jury to read that portion of the indictment for themselves. Since the court explained in its charge that the indictment was not evidence, this instruction was proper. "The mere fact that the judge told the jury to read the indictment themselves, rather than reading it to them, could not have prejudiced [the] appellant[s]." *United States v. Jones,* 587 F.2d 802, 806 (5th Cir. 1979). Maynard argues further that the court should have removed from the jury's consideration those overt acts which the government had not proved; as we found in Part II of this opinion, however, the evidence was sufficient to support a verdict on any or all of the alleged overt acts.

■ Third, each of the defendants argues that the court erroneously refused a requested instruction that required the jury to be unanimous as to the *same* overt acts that formed the basis of their verdict. The defendants rely for this contention on *United States v. Gipson,* 553 F.2d 453 (5th Cir. 1977), in which we reversed the conviction of a defendant under 28 U.S.C. § 2313 (1976) (selling or receiving a stolen vehicle moving in interstate commerce) because the jury was instructed it need not agree as to which of several acts prohibited by the statute and charged in the indictment (receiving, concealing, storing, bartering, selling and disposing) was established at trial.

While we rejected the charge given in *Gipson,* however, we stated that the jury need not unanimously agree as to which act the government established within either of "two distinct conceptual groupings; the first consisting of receiving, concealing, and storing, and the second comprised of bartering, selling, and disposing." 553 F.2d at 458. We explained:

> Within each grouping, the acts are sufficiently analogous to permit a jury finding of the actus reus element of the offense to be deemed "unanimous" despite differences among the jurors as to which of the intra-group acts the defendant committed.

*Id. See also United States v. Freeman,* 619 F.2d 1112, 1118–19 (5th Cir. 1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981) (jury need not be unanimous as to whether conspiracy was single or multiple). We are convinced that in this case the jury need not specifically have considered and agreed as to which of a large number of potential overt acts of bribery were established by the government. These acts were not distinguished in any significant respect and the evidence as to each is remarkably similar. Therefore this series of alleged acts comprises one "conceptual group" and the jury need not have unanimously agreed as to which was proven.

■ Fourth, Sutherland and Maynard argue that certain essential elements of the crime (that at least one defendant was associated with the Municipal Court; that the court is a RICO enterprise; and that the court affected interstate commerce) were not adequately specified in the charge. These elements were all included and explained in the court's instructions, Trial Transcript at 1491–94, but the defendants

point to another portion of the charge, Trial Transcript at 1495, where the court listed elements of the crime without including these requirements. This argument is frivolous. The court's instructions should be read in their entirety. When so read, the court's charge of the elements of the offense is not rendered inadequate solely because the elements were not included together in a single list. *E. g., United States v. Cook*, 586 F.2d 572, 579 (5th Cir. 1978), cert. denied, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979).

■ Fifth, Walker and Maynard each challenge the court's instruction requiring only that "at least one of the conspirators" have committed "at least two of the overt acts described in the indictment." The defendants contend that the court should have instructed the jury that *each* defendant must have committed "at least two predicate crimes in furtherance of the conspiracy." This argument confuses conspiracy to commit a RICO offense with the substantive RICO offense itself. The substantive crime does require each defendant to have committed at least two predicate acts of racketeering activity, but a *conspiracy* charge is based instead on an agreement to do so; to prove such an agreement, the government need only demonstrate some overt act, by any defendant, in furtherance of the agreement. *See* note 4 *supra*. Maynard also argues that this instruction was erroneous because it did not state, in accordance with *Elliott*, that each defendant "by his words or actions, must have objectively manifested an agreement to participate, directly or indirectly, in the affairs of an enterprise through the commission of two or more predicate crimes." *Elliott*, 571 F.2d at 903 (emphasis deleted). We disagree, for the record shows that this precise instruction was in fact given by the court. Trial Transcript at 1496.

## VII. PROSECUTORIAL MISCONDUCT

■ Sutherland and Maynard each argue that they are entitled to a new trial because of the government's introduction of what the defendants assert was perjured testimony. Specifically, the defendants point to the government's introduction in rebuttal of the testimony of Betty McAlister, who supported Kalastro's testimony as to the existence of a ticket fixing scheme, and stated that McAlister had herself had several tickets fixed by Walker. This testimony contradicted McAlister's testimony before the grand jury, at which time McAlister had denied the existence of any ticket fixing scheme and had denied having any of her own tickets disposed of thereby. Assuming *arguendo* that McAlister's testimony at trial was untrue, however, the defendants nevertheless are not entitled to relief. As we have only recently explained:

> [D]ue process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution actually knows or believes the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements.

*United States v. Brown*, 634 F.2d 819, 827 (5th Cir. 1981). The defendants suggest no reason to assume the government was aware of any actual perjury. In fact, McAlister's grand jury testimony was available to the defendants, and did form the basis of substantial cross-examination as to prior inconsistent statements contained therein. Therefore the defendants have not established any prosecutorial misconduct with respect to McAlister's testimony.

Sutherland and Maynard also argue that they are entitled to a new trial because of the government's failure to disclose exculpatory evidence in accordance with *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The defendants assert, in particular, that the following information was not divulged prior to trial: (1) that Kalastro had been accused by her employer of embezzlement; (2) that McAlister had given prior inconsistent testimony before the grand jury; (3) that the public records of Sutherland's court did not include any reference to any traffic citations of Kalastro and certain other government witnesses; and (4) that certain tickets of various government witnesses were processed in a court other than Sutherland's.

■ Neither Sutherland nor Maynard specifically requested any of this evidence

before trial. Their general requests for exculpatory *Brady* material must, therefore, be read as if no request had been made at all. *United States v. Agurs*, 427 U.S. 97, 106–07, 96 S.Ct. 2392, 2398–99, 49 L.Ed.2d 342 (1976). In such a case, the government need disclose the information only if it "creates a reasonable doubt that would not otherwise exist." *Id.*, 427 U.S. at 112, 96 S.Ct. at 2402. In the context of the overwhelming evidence introduced by the government in this case, *see* Part II of this opinion, this standard clearly is not met with respect to any of the purportedly withheld evidence. Moreover, some of this evidence would have been disclosed by the defendants' own examination of the public records of the Municipal Court, and all of it was made available to the defendants at the time of trial. The defendants do not suggest how a "reasonable doubt that would not otherwise exist" might have followed from their earlier receipt of this evidence.

## VIII. CONCLUSION

Since we find no reversible error in the defendants' trial, we affirm each defendant's conviction under 18 U.S.C. § 1962(d).

AFFIRMED.