**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 94-60812
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRIGIDO MARMOLEJO, JR. and MARIO SALINAS,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Texas
_____

June 13, 1996

Before JOLLY, WIENER, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Brigido Marmolejo, Jr. and Mario Salinas, the former Sheriff and Chief Deputy Sheriff of Hidalgo County, Texas were convicted of various offenses arising from a series of bribes that Marmolejo received, and Salinas aided and abetted, in exchange for permitting conjugal visits for a federal prisoner housed at the Hidalgo County Jail. Marmolejo appeals his conviction and his sentence. Salinas appeals only his conviction. We affirm both defendants' convictions, but vacate Marmolejo's sentence and remand for resentencing.

I

While Marmolejo was the Sheriff of Hidalgo County, Texas, Homero Beltran-Aguirre (Beltran) was a federal prisoner housed at the Hidalgo County Jail pursuant to an agreement between the United States Marshals Service and Hidalgo County.[1] As Sheriff of Hidalgo County, Marmolejo was in charge of the operation of the Hidalgo County Jail. Salinas was Marmolejo's immediate subordinate as the Divisional Chief for Detention of the Hidalgo County Sheriff's Office.

Beltran was housed at the Hidalgo County Jail on two separate occasions: first, from June 7, 1991 to April 14, 1992, and second, from November 6, 1992 to April 26, 1993. The series of bribes comprising the pattern of racketeering charged in the indictment against Marmolejo and Salinas occurred during these periods.

As a result of the bribery scheme between Marmolejo and Beltran, Marmolejo and Salinas were convicted of numerous offenses. A jury found Marmolejo guilty of violating RICO, in violation of 18 U.S.C. § 1962(c), RICO conspiracy, in violation of 18 U.S.C. § 1962(d), two counts of bribery in relation to a program receiving more than $10,000 in federal funds, in violation of 18 U.S.C. § 666(a)(1)(B) and 18 U.S.C. § 2, aiding and abetting money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(I) and 18 U.S.C. § 2, two counts of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(I), and travel in interstate commerce to

---

[1] This agreement is described in detail in Part II *infra.*

promote bribery, in violation of 18 U.S.C. § 1952(a)(3).  A jury found Salinas guilty of RICO conspiracy, in violation of 18 U.S.C. § 1962(d), and two counts of bribery in relation to a program receiving more than $10,000 in federal funds, in violation of 18 U.S.C. § 666(a)(1)(B) and 18 U.S.C. § 2.  Both defendants filed timely appeals.

## II

Marmolejo and Salinas argue several points of error concerning their convictions for bribery under 18 U.S.C. § 666(a)(1)(B), which prohibits theft and bribery by officials of state and local agencies that receive federal funds.[2]  We review questions of statutory interpretation *de novo*.  *United States v. Westmoreland,* 841 F.2d 572, 576 (5th Cir.), *cert. denied*, 488 U.S. 820, 109 S. Ct. 62, 102 L. Ed. 2d 39 (1988).  "Courts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language.  '[O]nly the most extraordinary showing of contrary intentions' in the legislative history will justify

---

[2]     Section 666 applies to an "organization, government, or agency [that] receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance."  18 U.S.C. § 666(b).
The section under which the defendants were convicted punishes anyone who:

>  (a)(1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof))
>  > (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more . . . .

18 U.S.C. § 666(a)(1)(B).

departure from that language." *United States v. Albertini,* 472
U.S. 675, 680, 105 S. Ct. 2897, 2902, 86 L. Ed. 2d 536 (1985)
(citations omitted) (quoting *Garcia v. United States,* 469 U.S. 70,
75, 105 S. Ct. 479, 482, 83 L. Ed. 2d 472 (1984)).

A

Section 666(b) restricts the statute to agencies that receive
"in any one year period, benefits in excess of $10,000 under a
Federal program involving a grant, contract, subsidy, loan,
guarantee, insurance or other form of Federal assistance." 18
U.S.C. § 666(b). The defendants contend that the district court
did not have jurisdiction to try the bribery counts under 18 U.S.C.
§ 666 because Hidalgo County did not receive "benefits in excess of
$10,000 under a Federal program" or any "other form of Federal
assistance." *Id.*

The parties dispute whether it is proper, in determining
whether Hidalgo County Jail received Federal assistance, to focus
on (1) a Cooperative Agreement Plan (CAP), which provided a
$850,000 grant for construction at the Hidalgo County Jail, *and* an
Intergovernmental Service Agreement (IGA), which provided that
Hidalgo County Jail would house federal prisoners in exchange for
their costs, or (2) just IGA.[3] This issue is relevant not only to

---

[3]     The government contends that CAP and IGA together constituted a
Federal program under § 666(b). The defendants argue that the construction grant
issued pursuant to CAP is irrelevant to an analysis of what, if any, Federal
assistance the Hidalgo County Jail received while Beltran was in the jail. They
argue that because CAP was entered into and completed in 1984 and the bribery
scheme occurred between 1991 and 1993, CAP could not qualify as Federal
assistance received in a one year period before or after the date of the
commission of the offense. *See* 18 U.S.C. §§ 666(b) and 666(d)(5). The

determine whether the arrangement constituted a Federal program or Federal assistance, but also to determine whether Hidalgo County satisfies the requirement that it received the benefit within a one year period.[4]

The plain language of § 666(b) is ambiguous in defining "Federal program" and "Federal assistance." Although it is clear that the assistance can consist of a grant, contract, subsidy, loan, guarantee, or insurance, the other defining qualities of "Federal assistance" are still unclear. The legislative history, however, provides that the term "Federal program involving a grant, a contract, a subsidy, a loan, a guarantee, insurance, or another form of Federal assistance" should be construed broadly. S. Rep. No. 225, 98th Cong., 2d Sess. 369 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3511 [hereinafter S. Rep. No. 225]. We must determine, therefore, whether under a broad interpretation of "Federal assistance," it is proper to analyze IGA and CAP collectively as a single agreement because they are so

_____

defendants argue further that IGA does not qualify as "Federal assistance" or a "Federal program" because it was simply a contract for services rendered, and thus a commercial transaction exempted from the statute by §§ 666(b) and (c).

[4] Section 666(d)(5) defines a one-year period as "a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense. Such period may include time both before and after the commission of the offense." Because Hidalgo County received the $850,000 construction grant in 1984, and because the offenses committed in this case occurred from June 1991 to April 1992 and from November 1992 to July 1993, and assuming that only CAP is a Federal program under § 666(b), Hidalgo County would not have received the required amount of benefit within the relevant one-year period. However, if IGA and CAP should be viewed collectively as one agreement, and the agreement constitutes a Federal program, then the one-year requirement would be met, because Hidalgo County received approximately $840,000 per year pursuant to IGA for housing federal prisoners *at cost* per CAP during the time that Beltran was housed at the jail.

interrelated.

IGA and CAP were entered into in 1984 to establish and govern relations between the U.S. Marshals Service and Hidalgo County. CAP was the first agreement; it provided for "Federal participation in the funding of local governmental jail construction, renovation or improvement programs" and was "predicated upon the Federal government's requirement for detention space and services and the local government's provision of such services." As a condition to the receipt of this grant, Hidalgo County Jail had to guarantee that it would provide detention space for federal prisoners. The second agreement, IGA, established the actual formal relationship between the U.S. Marshals Service and other federal user agencies and Hidalgo County for the detention of federal prisoners. Although Hidalgo County had already guaranteed that it would provide such space, IGA established the specific provisions and requirements of the agreement including the compensation that Hidalgo County would receive.

These agreements are so interrelated that they must be viewed collectively as one agreement, especially given the fact that the grant issued pursuant to CAP was conditioned on the agreement in IGA. Having reviewed the nature and purposes of CAP and IGA, we conclude that together they constituted "Federal assistance" or a "Federal program" under 18 U.S.C. § 666(b), consisting of a grant, CAP, and a contract, IGA. Our holding is supported by the broad construction of § 666(b) mandated in the legislative history. S.

Rep. No. 225 at 3511.

Focusing exclusively on IGA, the defendants argue that the arrangement between Hidalgo County and the U.S. Marshals Service was a commercial transaction. In urging that this is a commercial transaction, the defendants emphasize the fact that the U.S. Marshals Service received something in return for the funds it provided to Hidalgo County.[5]

The legislative history again demonstrates why the defendants' argument must fail. The Senate Report states that the goal in enacting 18 U.S.C. § 666 was to protect the integrity of federal funds by punishing theft and bribery involving Federal programs for which there is "a specific statutory scheme authorizing the Federal assistance in order to promote or achieve certain policy objectives." S. Rep. No. 225 at 3510. Focusing on this legislative history, the Second Circuit in *United States v. Rooney*, 986 F.2d 31, 35 (2d Cir. 1993) rejected a *quid pro quo* argument similar to that argued by Marmolejo and Salinas. The *Rooney* court

---

[5] The defendants appear to argue that as a "commercial transaction," this arrangement would be excluded from the statute by §§ 666(b) and (c). However, § 666(c), which excludes "bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business," refers to the alleged wrongdoing, to ensure that the statute is not applied to "acceptable commercial and business practices," H.R. Rep. No. 797, 99th Cong., 2d Sess. 30, *reprinted in* 1986 U.S.C.C.A.N. 6138, 6153, not to the nature of the benefit that the agency receives pursuant to the Federal program. *See United States v. Valentine,* 63 F.3d 459, 465 (6th Cir. 1995) (declining to hold that the use of employees for personal benefit is in the usual course of business); *United States v. Grubb,* 11 F.3d 426 (4th Cir. 1993) (declining to hold that salary obtained in exchange for $10,000 bribe was "bona fide"). *But see United States v. Nichols,* 40 F.3d 999, 1000 (9th Cir. 1994) (applying § 666(c) to the nature of the Federal assistance). Certainly the defendants are not arguing that the money they received from Beltran or the benefit that Beltran received from them was "bona fide" and "in the usual course of business." 18 U.S.C. § 666(c).

stated that the proper focus in determining whether federal funds constitute "Federal assistance" under § 666(b) is "whether the funds disbursed can be considered Federal assistance within a specific statutory scheme intended to promote public policy objectives and not payments by the government as a commercial entity." *Rooney,* 986 F.2d at 35. Finding that the statute equated "benefit" with "Federal assistance," the Second Circuit held that an Farmers Home Administration loan could constitute Federal assistance under § 666(b), despite the fact that the defendant was obligated to repay the loan plus interest, because the money the defendant received was authorized by a specific statute to accomplish specific policy goals established by Congress. *Id.* at 34-35.

Likewise, in this case, the funds that the federal government provided for Hidalgo County were authorized by a specific statute and were intended to further public policy goals. The fact that Hidalgo County housed federal prisoners in return for the money it received from the United States Marshals Service does not preclude the arrangement from being a Federal program under § 666(b). The federal funds were authorized by 18 U.S.C. § 4002 to fulfill the federal government's policy of providing "suitable quarters for the safekeeping, care, and subsistence of all persons held under authority of any enactment of Congress," 18 U.S.C. § 4002, and as stated in CAP, to provide for "[f]ederal participation in the funding of local governmental jail construction, renovation or

improvement programs."  Therefore the combination of CAP and IGA qualifies  as a Federal program under § 666(b), regardless of the fact that the government received something in return for the assistance it provided to Hidalgo County.[6]

B

The defendants next argue that they were "improperly prosecuted" under 18 U.S.C. § 666(a)(1)(B).  They argue that in enacting 18 U.S.C. § 666, Congress did not intend to reach their behavior.  Specifically, they contend that there was not a business, transaction, or series of transactions "involving anything of value of $5,000 or more," as required under § 666(a)(1)(B).

Section 666(a)(1)(B) requires the government to prove that agents of a local government solicited, demanded, accepted, or agreed to accept anything of value from any person intending to be influenced "in connection with any business, transaction, or series of transactions of such government . . . involving anything of value of $5,000 or more."  18 U.S.C. § 666(a)(1)(B).  The evidence at trial demonstrated that Beltran was housed at the Hidalgo County Jail, pursuant to IGA.  After observing that several of the federal prisoners were receiving special treatment at the jail, Beltran entered into an agreement with Marmolejo to receive special

---

[6]    Because we hold that IGA and CAP together constitute a Federal program, Hidalgo County meets the one-year requirement as defined in 18 U.S.C. § 666(d)(5), because it received $840,000 a year for housing federal prisoners during the period in which the offenses were committed.

-9-

treatment in exchange for monetary consideration.  Specifically, Marmolejo allowed Beltran to have conjugal visits with his wife and girlfriend in exchange for $6,000 a month and $1,000 per visit. These visits took place in the jail library and eventually in Sheriff Marmolejo's office.

The evidence also disclosed that Marmolejo told Beltran's brother-in-law, Guardado, who often arranged the visits, that if Marmolejo was not available, he could contact Salinas about arranging a visit.  Marmolejo usually guarded his office door when Beltran and his wife or girlfriend were visiting.  However, Salinas supervised the visits on several occasions.  The evidence also established that Beltran instructed Guardado to purchase four sets of men and women's Rado watches, one set of which was given to Salinas and one set to Marmolejo.  Both Salinas and Marmolejo also received cars from Beltran.  Marmolejo was also involved in numerous financial transactions with Beltran.

We have previously held that § 666(a)(1)(B) does not require the government to prove that federal funds were directly involved in a bribery transaction, or that the federal monies funded the corrupt transaction.  *Westmoreland,* 841 F.2d at 578 (upholding conviction of a county supervisor under § 666(a)(1)(B) for taking bribes in connection with the granting of contracts for the maintenance of local roads and bridges although the funds corruptly disbursed were not federal funds).  Therefore, although the government did not have to trace any federal funds to the illegal

transaction between Beltran and Marmolejo and Salinas, we must consider whether the term "anything of value" in § 666(a)(1)(B) was intended to cover transactions involving intangibles, such as a conjugal visits, that are difficult to value.

We turn first to the plain language of the statute. The term "*anything* of value" in § 666(a)(1)(B) is broad in scope and contains no language restricting its application to transactions involving money, goods, or services. Similarly, the statute does not require that the organization, government, or agency or the person giving the agent the bribe, valued the transaction at $5,000 or more. We hold, therefore, that the plain meaning of the statute compels our conclusion that the term "anything of value" in § 666(a)(1)(B) includes transactions involving intangible items, such as the conjugal visits at issue in this case.[7] *See United States v. Mongelli,* 794 F. Supp. 529, 531 (S.D.N.Y. 1992) (holding that term "anything of value" in 18 U.S.C. § 666(a)(1)(B) includes intangibles).

This broad language squares with Congress's intent in enacting 18 U.S.C. § 666 to safeguard "the integrity of federal funds by assuring the integrity of the organizations or agencies that receive them." *Westmoreland,* 841 F.2d at 577, 578. The Senate

---

[7] We note that the dissent's belief that the relevant language of § 666(a)(1)(B) ambiguous, directly contradicts our finding in *Westmoreland,* 841 F.2d at 576. In *Westmoreland*, we rejected the defendant's argument that "sufficient statutory ambiguity exists to invoke the rule of strict construction applicable to criminal statutes and the rule that congressional intent, as evidenced by the legislative history, controls," because we found the statutory language "plain and unambiguous." *Id.* at 575-76.

-11-

Report stated that:

> [18 U.S.C. § 666 was] designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program.

S.Rep. No. 225 at 3510. Specifically, the statute was intended to fill a gap in the then-current federal bribery and theft statutes caused by the difficulty of tracing federal monies.[8] To accomplish its goal, Congress "cast a broad net to encompass local officials who may administer federal funds, regardless of whether they actually do." *Id.* at 577.

We also note that other courts have interpreted the term "anything of value" in criminal statutes broadly to include

---

[8]     The Senate Report described the then-existing state of the law:

[T]itle XI covers both theft and bribery type offenses. With respect to theft, 18 U.S.C. § 665 makes theft or embezzlement by an officer or employee of an agency receiving assistance under the Job Training Partnership Act a Federal offense. However, there is no statute of general applicability in this area, and thefts from other organizations or governments receiving Federal financial assistance can be prosecuted under the general theft of Federal property statute, 18 U.S.C. 641, only if it can be shown that the property stolen is property of the United States. In many cases, such prosecution is impossible because title has passed to the recipient before the property is stolen, or the funds are so commingled that the Federal character of the funds cannot be shown. This situation gives rise to a serious gap in the law, since even though title to the monies may have passed, the Federal Government clearly retains a strong interest in assuring the integrity of such program funds. Indeed, a recurring problem in this area (as well as in the related area of bribery of the administrators of such funds) has been that State and local prosecutors are often unwilling to commit their limited resources to pursue such thefts, deeming the United States the principal party aggrieved.
    With respect to bribery, 18 U.S.C. 201 generally punishes corrupt payments to Federal public officials, but there is some doubt as to whether or under what circumstances persons not employed by the Federal Government may be considered as a "public official" under the definition in 18 U.S.C. 201(a). . . .
S.Rep. No. 225 at 3510.

intangibles. *See United States v. Nilsen,* 967 F.2d 539, 542 (11th Cir. 1992) (stating that "Congress' frequent use of 'thing of value' in various criminal statutes has evolved the phrase into a term of art which the courts generally construe to envelope both tangibles and intangibles"), *cert. denied*, 507 U.S. 1034, 113 S. Ct. 1856, 123 L. Ed. 2d 478 (1993); *United States v. Piquet,* 963 F.2d 54, 55 (5th Cir.) (holding that the term "anything of value" in 18 U.S.C. § 1029(a)(2) should be interpreted broadly), *cert. denied*, 506 U.S. 902, 113 S. Ct. 290, 121 L. Ed. 2d 215 (1992); *United States v. Girard,* 601 F.2d 69, 71 (2d Cir.) (holding that term "thing of value," when used in criminal statutes, such as in 18 U.S.C. § 641, includes intangibles, such as amusement, sexual intercourse, a promise to reinstate an employee, and information), *cert. denied*, 444 U.S. 871, 100 S. Ct. 148, 62 L. Ed. 2d 96 (1979); *see also United States v. Williams,* 705 F.2d 603, 622-23 (2d Cir.) (holding that term "anything of value" in 18 U.S.C. § 201(c) and 18 U.S.C. § 201(g) can apply to stock that, although it had no actual value, the defendant expected it to have value), *cert. denied*, 464 U.S. 1007, 104 S. Ct. 524, 78 L. Ed. 2d 708 (1983); *McDonald v. State,* 329 So.2d 583, 587-88 (1975) (holding that sexual intercourse or the promise of sexual intercourse is a "thing of value" under state bribery statute), *cert. denied*, 429 U.S. 834, 97 S. Ct. 99, 50 L. Ed. 2d 99 (1976); *Scott v. State,* 141 N.E. 19, 22-23 (1923) (same).

Because the conduct in this case involves serious acts of

bribery by agents of a local government who were carrying out their duties under a Federal program, we conclude that this case is within the scope of conduct Congress intended to encompass with 18 U.S.C. § 666.[9]  As Sheriff and Chief Deputy Sheriff of Hidalgo County, the defendants were in charge of carrying out the Federal program of housing and safekeeping the federal prisoners, including Beltran, at Hidalgo County Jail.  Part of their responsibilities pursuant to IGA was to provide and regulate the prisoners' visitation rights.    As agents of the Hidalgo County Jail,

---

[8]      The defendants argue that even if their actions meet the literal definition of the statute, Congress did not intend to punish their type of behavior in enacting 18 U.S.C. § 666.  Again, the legislative history supports our finding that this prosecution was proper.  The Senate Report stated that Congress intended 18 U.S.C. § 666 to encompass behavior in three specific cases, each of which involved an organization or agency that provided the Federal government with a service by administering a government program, much like the Hidalgo County Jail did in this case.  S. Rep. No. 225 at 3511 (citing *United States v. Hinton,* 683 F.2d 195 (7th Cir. 1982) (involving head of a nonprofit corporation organized to administer federal funds from a HUD program who solicited money in exchange for housing rehabilitation contracts funded by HUD), *aff'd sub nom. Dixson v. United States,* 465 U.S. 482, 104 S. Ct. 1172, 79 L. Ed. 2d 458 (1984); *United States v. Mosley,* 659 F.2d 812 (7th Cir. 1981) (involving head of state administrator of funds from a CETA program who solicited money in exchange for preferential treatment under the program); *United States v. Del Toro,* 513 F.2d 656 (2d Cir.) (involving bribery of city administrator of funds from HUD program), *cert. denied*, 423 U.S. 826, 96 S. Ct. 41, 46 L. Ed. 2d 42 (1975).

Defendants cite *United States v. Cicco,* 938 F.2d 441 (3d Cir. 1991), as support for their argument that Congress did not intend to reach their behavior in enacting 18 U.S.C. § 666.  The facts of *Cicco,* however, do not support their argument.  In *Cicco*, the defendants were indicted for soliciting political support in exchange for the retention of municipal jobs.  The Third Circuit reasoned that the legislative history revealed that Congress enacted § 666 to enlarge those covered by federal bribery laws, not "the sort of 'political patronage harassments' alleged" in that case.  *Id.* at 446 (quoting S.Rep. No. 1245, 94th Cong., 2d Sess. 2, *reprinted in* 1976 U.S.C.C.A.N. 2883, 2884).  Because the defendants' behavior in *Cicco* was covered by another criminal statute, 18 U.S.C. § 601, which was "'directed at protecting federally-funded employment from partisan favoritism,'" the court concluded that Congress did not intend to encompass such behavior under § 666.  *Id.*  The *Cicco* court was persuaded in particular by the fact that if the conduct at issue was covered by § 666 as well as § 601, the punishment would have been ten times as severe under § 666, and without any mention of § 601 in the legislative history, the *Cicco* court was not prepared to conclude that Congress intended such a result.  *Id.* Instead, the court believed "Congress intended § 666 to address different and more serious criminal activity" involving theft and bribery.  *Id.*

-14-

Marmolejo and Salinas accepted money, watches, and cars intending to be influenced in connection with transactions of the jail, namely, the issuance and regulation of prisoner visits with family and friends. The transactions involved something of value))conjugal visits that Beltran was willing to pay for.

We must now determine whether these conjugal visits had a value of $5,000 or more. Again, we observe that the statute does not contain language "to indicate that 'any transaction involving $5,000' means 'any federally funded transaction involving $5,000' or 'any transaction involving $5,000 of federal funds.'" *Westmoreland,* 841 F.2d at 576. "[A]ny reference to federal funds is conspicuously absent from the operative provisions," allowing Congress to ensure the integrity of federal funds by protecting the integrity of the organizations that receive them. *Id.* at 577-78. The statute does not specifically require that the payor or the payee of the bribe value the transaction at $5,000.[10] Instead, the

_____

[10] *Compare Westmoreland,* 841 F.2d at 576-78 (stating that the unambiguous language of § 666(a)(1)(B) does not require the government to establish any relation between the transaction involving a "thing of value of $5,000" and the federal funds the agency receives) *with United States v. Foley,* 73 F.3d 484, 490 (2d Cir. 1996) (stating that § 666(a)(1)(B) was enacted to permit prosecution for bribery in connection with federal program funds, therefore, in determining whether a transaction involves "anything of value of $5,000 or more," the "value must be connected, even if only indirectly, to the integrity of federal program funds"). The dissent claims that *Foley* holds that "the proper method to value a transaction is from the perspective of the protected entity." However, *Foley's* only statement about assessing the "thing's value" states that it must be connected to the integrity of the federal program funds. *Foley,* 73 F.3d at 490. *Foley* does intimate that if the transaction involved in that case had affected the financial interests of the protected local organization, then that case *might* have been properly prosecuted under § 666(a)(1)(B). *Id.* at 492-93. However, the only decisive language in *Foley* concerns the fact that the federal program funds were not affected, even indirectly, by the transaction. *Id.* at 490, 492 & 493. We note that the plaintiff in *Westmoreland* could not have been convicted under § 666(a)(1)(B) under the holding in *Foley*. *Foley* requires a connection between the

-15-

$5,000 triggering provision ensures that the statute reaches acts of bribery involving transactions of substantial value. *Id.* at 578. To decide whether a transaction involving intangibles has a value of $5,000 or more, courts should look to traditional valuation methods. *See Mongelli,* 794 F. Supp. at 531. We conclude that the conjugal visits in this case did have a value which exceeded $5,000. We arrive at this estimate in the same way that an appraiser would value an asset))by looking at how much a person in the market would be willing to pay for them. *Id.; see also Herman v. United States,* 289 F.2d 362 (5th Cir.) (stating that to determine if the value of stolen property is $5,000 or more, as required in 18 U.S.C. § 2314, courts must look at "the price a willing buyer would pay a willing seller at the time and place the property was stolen"), *cert. denied*, 368 U.S. 897, 82 S. Ct. 174, 7 L. Ed. 2d 93 (1961); *United States v. Seagraves,* 265 F.2d 876 (3d Cir. 1959) (stating that amount defendants paid for stolen property can form basis for expert's valuation of the property under 18 U.S.C. § 2314). Pursuant to the bribery transactions, Beltran was willing to pay Marmolejo $6,000 a month plus $1,000 for each visit. Therefore, the transactions between Beltran and Marmolejo and

transaction's value of $5,000 or more and the integrity of the federal program funds that the government receives. The *Foley* court stated that the legislative history indicated that § 666(a)(1)(B) was "not designed for the prosecution of corruption that was not shown in some way to touch upon federal funds." *Foley*, 73 F.3d at 493. However, the plaintiff in *Westmoreland,* a county supervisor, was convicted of accepting bribes in exchange for effecting sales transactions worth $14,482.92. We upheld her conviction even though it was undisputed that the alleged acts of bribery concerned only state monies, not the federal funds that the county received. To the extent that the *Foley* court would have reversed her conviction under § 666(a)(1)(B), this case is in conflict with Fifth Circuit law.

Salinas involved something "of value of $5,000 or more." Accordingly, we conclude that Marmolejo and Salinas were properly prosecuted under 18 U.S.C. § 666(a)(1)(B).[11]

## III

At trial, the government alleged that the defendants violated TEX. PENAL CODE ANN. § 36.02(a)(1), which constituted "predicate acts establishing a pattern of racketeering activity" in violation of RICO.[12] *See* 18 U.S.C. § 1962(c). A state offense can only constitute a predicate act establishing a pattern of racketeering activity if the offense is punishable by more than one year in prison. 18 U.S.C. § 1961(1)(A). Salinas and Marmolejo allege that their prosecution under TEX. PENAL CODE ANN. § 36.02(a)(1) was improper because a more specific statute, TEX. PENAL CODE ANN.

---

[11] The defendants' final argument with respect to 18 U.S.C. § 666 is that the Sheriff's office is not an agent of a local government as required by § 666(a)(1). Section 666 applies to every "agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof." 18 U.S.C. § 666(a)(1). "Local" is defined as "of or pertaining to a political subdivision within a state." 18 U.S.C. § 666(d)(3). It is clear that this statute was intended to encompass all employees of all governmental agencies and their subdivisions. *See* 18 U.S.C. § 666(d)(2). The Hidalgo County Sheriff's office is an agency of Hidalgo County, and both defendants are agents of the Sheriff's office; therefore, they are covered by the statute.

Salinas also argues that there was insufficient evidence to convict him of aiding and abetting Marmolejo's violation of 18 U.S.C. § 666(a)(1)(B). After a careful review of the record, we conclude there was sufficient evidence to sustain the conviction.

[12] TEX. PENAL CODE ANN. § 36.02(a)(1) provides:

A person commits an offense if he intentionally or knowingly offers, confers, or agrees to confer on another, or solicits, accepts, or agrees to accept from another any benefit as consideration for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant, party official, or voter.

-17-

§ 36.08(b), applies to their conduct.[13]   They rely on a well-established rule of construction "that if two legal provisions apply, one general and one specific, the specific takes precedence."  *United States v. Tunnell,* 667 F.2d 1182, 1185 (5th Cir. 1982).   While TEX. PENAL CODE ANN. § 36.02(a)(1) is a felony punishable by more than one year in prison, TEX. PENAL CODE ANN. § 36.08(b) is a misdemeanor which is not punishable by more than one year in prison.  Therefore, if the defendants should have been prosecuted under § 36.08(b) instead of § 36.02(a)(1), they would not have committed predicate acts constituting racketeering activity in violation of RICO.

Having reviewed the evidence against the defendants, we hold that they were properly charged under TEX. PENAL CODE ANN. § 36.02(a)(1), which prohibits accepting bribes, rather than § 36.08(b), which prohibits accepting gifts.  The appropriate inquiry is which statute criminalizes the defendants' conduct here. *See Tunnell,* 667 F.2d at 1185 (concluding that defendants were properly charged under the statute which criminalized their exact behavior).  The evidence at trial demonstrated an elaborate system of bribes between Marmolejo and Beltran, aided and abetted by Salinas.  The cash payments, watches, and other consideration that the defendants received were not gifts; they were given as payment

---

[13]     TEX. PENAL CODE ANN. § 36.08(b) provides that "[a] public servant in an agency having custody of prisoners commits an offense if he solicits, accepts, or agrees to accept any benefit from a person the public servant knows to be in his custody or the custody of his agency."

for conjugal visits and other special favors. Thus the defendants were properly convicted under the more serious statute, § 36.02(a)(1), which prohibited the exact behavior which they engaged in))bribery. *See id.* at 1185; *Cerda v. State,* 750 S.W.2d 925, 927 (Tex. App.))Corpus Christi 1988, pet. ref'd).[14]

IV

Salinas appeals the trial court's jury instruction on the RICO conspiracy count,[15] arguing that it erroneously allowed the jury to convict him without proof that he performed or agreed to perform personally two of the predicate acts which comprised the pattern of

---

[14] The defendants also argue that the government failed to prove that they were "public servant[s]" within the meaning of the statute and that they acted in a discretionary manner in allowing conjugal visits. TEX. PENAL CODE ANN. § 1.07(41)(A) defines public servant as one who is "elected, selected, appointed, employed, or otherwise designated as . . . an officer, employee, or agent of government." Marmolejo was elected Sheriff of Hidalgo County which is an agent of government; therefore, he satisfies this broad definition of public servant. Salinas also satisfies the definition because he was either selected or appointed as an employee of Hidalgo County.
   TEX. PENAL CODE ANN. §36.02(a)(1) punishes the receipt of benefits in exchange "for the recipient's decision, opinion, recommendation, vote, or other exercise of discretion as a public servant." The defendants argue that as jailers they act in a ministerial, not a discretionary manner. This argument is also without merit. Conjugal visits were not permitted under Hidalgo County Jail policy. They were allowed in this case, only as a result of Marmolejo's exercise of discretion, aided and abetted by Salinas, in exchange for money and other types of consideration.
   The defendants also argue that the government failed to prove that Beltran was in "custody." TEX. PENAL CODE ANN. §36.02(a)(1) does not require custody; therefore, this argument is also without merit.

[15] Salinas was charged with violating a substantive RICO provision, 18 U.S.C. § 1962(c), and with conspiring to violate a substantive RICO provision, 18 U.S.C. § 1962(d). He was acquitted of the substantive count, but convicted on the conspiracy count. Section 1962(d) provides that it is unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). Section 1962(c) prohibits "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).

racketeering activity.[16]  "While great latitude is shown the trial court in fashioning jury instructions, we will review [the instructions] to determine whether they accurately and completely state the law."  *Banc One Capital Partners Corp. v. Kneipper,* 67 F.3d 1187, 1192 (5th Cir. 1995).

Fifth Circuit cases have obfuscated the issue of whether each RICO conspirator must agree to commit personally two or more racketeering acts or whether it is sufficient that the conspirator simply agree that one of his co-conspirators will commit two or more racketeering acts.[17]  This issue has divided the circuits, with the majority holding that a RICO conspirator need only agree "that members of the conspiracy will violate [a substantive RICO provision] through the commission of two proscribed acts," not that he will personally commit two proscribed acts.[18]  *United States v.*

_____

[16]     The trial court's instruction on the RICO conspiracy count stated:

What you are being asked to decide in Count Two is . . . If Salinas was only involved in one or two or even none, did he, nevertheless, know about this pattern.  Did he know that this whole pattern of activity was going on and did he then knowingly and willfully join in and participate and contribute in some fashion.

[17]     Both the majority and the minority views on this issue ground their interpretation of § 1962(d) on *United States v. Elliott,* 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S. Ct. 349, 58 L. Ed. 2d 344 (1978).  "However, a reading of *Elliott* in conjunction with the later case of *United States v. Sutherland,* 656 F.2d 1181 (5th Cir. 1981) reveals that the Fifth Circuit had not definitively resolved this issue."  *United States v. Neapolitan,* 791 F.2d 489, 496 n.3 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S. Ct. 422, 93 L. Ed. 2d 372 (1986).

[18]     The majority consists of the Sixth, Third, Ninth, Eleventh, and Seventh Circuits.  *See United States v. Joseph,* 781 F.2d 549, 554 (6th 1986); *United States v. Adams,* 759 F.2d 1099, 1116 (3d Cir.), *cert. denied*, 474 U.S. 971, 106 S. Ct. 336, 88 L. Ed. 2d 321 (1985); *United States v. Tille,* 729 F.2d 615, 619 (9th Cir.), *cert. denied*, 469 U.S. 845, 105 S. Ct. 156, 83 L. Ed. 2d 93 (1984); *United States v. Carter,* 721 F.2d 1514, 1529 (11th Cir.), *cert. denied sub nom*, *Morris v. United States,* 469 U.S. 819, 105 S. Ct. 89, 83 L. Ed. 2d 36

-20-

*Neapolitan,* 791 F.2d 489, 494 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S. Ct. 422, 93 L. Ed. 2d 372 (1986).

Our decision in *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S. Ct. 349, 58 L. Ed. 2d 344 (1978) lays the groundwork for analyzing the present controversy. The issue in *Elliott* was whether the government can link together, under a RICO conspiracy charge, multiple conspiracies whose crimes may have no relation to each other except for their affiliation with a common criminal enterprise. *Id.* at 902-03. In answering this question affirmatively, we explained:

> the object of a RICO conspiracy is to violate a substantive RICO provision))here, to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity))and not merely to commit each of the predicate crimes necessary to demonstrate a pattern of racketeering activity. . . . Under the statute, it is irrelevant that each defendant participated in the enterprise's affairs through different, even unrelated crimes, so long as we may reasonably infer that each crime was intended to further the enterprise's affairs.

*Id.* at 902. Our subsequent cases have made it clear that to prove a RICO conspiracy "no actual acts of racketeering need occur; there need only exist a conspiracy to perform the necessary acts plus some overt action by one of the conspirators in furtherance of the conspiracy." *United States v. Phillips,* 664 F.2d 971, 1038 (5th

---

(1984); *Neapolitan,* 791 F.2d at 497. The First and Second Circuits currently compose the minority, holding that a RICO conspirator must personally agree to commit two predicate acts. *See United States v. Ruggiero,* 726 F.2d 913, 921 (2d Cir.), *cert. denied sub nom.*, *Rabito v. United States,* 469 U.S. 831, 105 S. Ct. 118, 83 L. Ed. 2d 60 (1984); *United States v. Winter,* 663 F.2d 1120, 1136 (1st Cir. 1981), *cert. denied*, 460 U.S. 1011, 103 S. Ct. 1250, 75 L. Ed. 2d 479 (1983).

Cir. 1981) (citing *United States v. Sutherland,* 656 F.2d 1181, 1187 n.4 (5th Cir. 1981), *cert. denied*, 455 U.S. 949, 102 S. Ct. 1451, 71 L. Ed. 2d 663 (1982)), *cert. denied sub nom., Meinster v. United States*, 457 U.S. 1136, 102 S. Ct. 2965, 73 L. Ed. 2d 1354 (1982). Yet, our cases have still not resolved what RICO conspirators must individually agree to.

Today we join the majority view among the circuits in holding that to be guilty of RICO conspiracy, the conspirator must simply agree "to the objective of a violation of RICO; he need not agree personally to violate the statute." *Neapolitan,* 791 F.2d at 498. Our decision is mandated not only by the plain language of the RICO statute, but also by the nature and purpose of the statute.

Section 1962(d) specifically prohibits a conspiracy to violate any of the substantive RICO provisions. 18 U.S.C. § 1962(d). Nothing in this language indicates that Congress intended to do anything more than to criminalize a conspiratorial objective))the violation of a substantive RICO provision. *Sutherland,* 656 F.2d at 1193; *Elliott,* 571 F.2d at 903; *Neapolitan,* 791 F.2d at 497. If we were to hold that in addition to agreeing to the overall criminal objective, a RICO conspirator had to agree to perform the actual crime, two predicate acts comprising a substantive violation of RICO, this holding would be a marked departure from traditional conspiracy law for which there is no support in the language of the statute or the statutory history. *Neapolitan,* 791 F.2d at 497-98 ("Requiring an agreement personally to commit two predicate acts

would establish a new form of conspiring in contradistinction to section 1962(d)'s base in traditional conspiracy law.").

The Congressional purpose in enacting RICO was to provide a new remedy to punish organized crime. *Id.* at 495 & 498; *see United States v. Barton,* 647 F.2d 224, 237-38 (2d Cir. 1981) ("It is the purpose of this Act to seek the eradication of organized crime in the United States . . . by establishing new penal prohibitions, and by providing enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crimes.") (quoting The Statement of Findings of the Organized Crime Control Act of 1970, 84 Stat. 923), *cert. denied*, 454 U.S. 857, 102 S. Ct. 307, 70 L. Ed. 2d 152 (1981). To be guilty of a RICO violation, one must have violated other laws in a way that implicates RICO. *Neapolitan,* 791 F.2d at 497 ("The statute does not create a new type of crime; it establishes prerequisites for the imposition of harsher penalties."). Therefore to be an effective tool against organized crime, a RICO conspiracy should not require anything more than is required to conspire to violate any other federal crime. *Id.* This conclusion is bolstered by the expansive reading that the Supreme Court has given the statute.[19]

Having concluded that a RICO conspirator need not agree to personally perform the two predicate acts which compose the substantive violation of RICO, we find that the court's

---

[19]    *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 498, 105 S. Ct. 3275, 3286, 87 L. Ed. 2d 346 (1985).

instructions were an accurate statement of the law.[20]

V

Section 1963(a) provides that anyone who violates RICO must forfeit any interest that they have acquired or maintained in violation of the statute, any enterprise that they have established or conducted in violation of RICO, and any property constituting or derived from proceeds obtained from racketeering activity in violation of RICO. 18 U.S.C. § 1963(a). Section 1963(m) provides that if by some "act or omission of the defendant" the government cannot locate the property it is authorized to forfeit by subsection (a), "the court shall order the forfeiture of any other property of the defendant up to the value of any property" that the defendant has made untraceable. 18 U.S.C. § 1963(m). The government sought the forfeiture of $151,000 in bribe proceeds from Marmolejo pursuant to 18 U.S.C. § 1963(a). Marmolejo argues that the court erred in authorizing the forfeiture of substitute assets without requiring the government to prove that he made unavailable the assets that he obtained from his violations of RICO. We review

---

[20] Salinas also argues that there was insufficient evidence to support his conviction for RICO conspiracy. In reviewing a sufficiency of the evidence challenge, we view "the evidence in the light most favorable to the jury verdict and affirm[] if a rational trier of fact could have found that the government proved all essential elements of the crime beyond a reasonable doubt." *United States v. Puig-Infante,* 19 F.3d 929, 937 (5th Cir.), *cert. denied*, ___ U.S. ___, 115 S. Ct. 180, 130 L. Ed. 2d 115 (1994). To prove a RICO conspiracy charge, the government must prove "that the defendant conspired to engage in a pattern of racketeering activity." *United States v. Marcello,* 876 F.2d 1147, 1152-53 (5th Cir. 1989). To establish a pattern of racketeering activity, the government must prove "two predicate acts, each of which must be a criminal offense." *Id.* Having carefully reviewed the record, we conclude that there was sufficient evidence to convict Salinas of RICO conspiracy.

-24-

the district court's findings of fact under the clearly erroneous standard of review, and the question of whether those facts constitute legally proper forfeiture *de novo*. *United States v. 1977 Porsche Carrera*, 946 F.2d 30, 33 (5th Cir. 1991).

One of the specific ways that § 1963(m) provides that the government can forfeit substitute property is if some of the property, "as a result of any act or omission of the defendant has been transferred or sold to, or deposited with, a third party." 18 U.S.C. § 1963(m)(2). At the forfeiture hearing, both Marmolejo and the government stipulated that if a government agent were called to testify he would testify that he could not locate the specific property the government sought to forfeit because "some of the property had been transferred, sold or deposited with third parties." Marmolejo's attorney specifically acknowledged that the government could not trace any of Marmolejo's assets. Furthermore, Marmolejo did not oppose the district court's Order of Forfeiture which specifically stated that the parties stipulated that forfeiture of substitute assets was appropriate. Therefore, given that both parties stipulated that substitution of assets was appropriate, and because the court's decision was based on a legally proper ground, § 1963(m)(2), we hold that the forfeiture was proper.

VI

Defendants argue that the district court erred in denying their motions to suppress evidence seized pursuant to a search

-25-

warrant that they allege was invalid.[21] In reviewing a district court's denial of a motion to suppress evidence obtained pursuant to a search warrant we must decide: "(1) whether the good-faith exception to the exclusionary rule applies; and (2) whether probable cause supported the warrant." *United States v. Satterwhite,* 980 F.2d 317, 320 (5th Cir. 1992) (footnote omitted). However, because this case does not involve novel issues of law that need to be resolved to assist law enforcement officers and magistrate judges in the future, we need not decide whether the warrant was supported by probable cause if we find that the good-faith exception to the exclusionary rule applies. *Id.; United States v. Restrepo,* 994 F.2d 173, 187 (5th Cir. 1993).

"When a warrant is supported by more than a 'bare bones' affidavit, officers may rely in good faith on the warrant's validity" in conducting a search. *Satterwhite,* 980 F.2d at 321. However, an affidavit that contains only conclusions and "lack[s] the facts and circumstances from which a magistrate can independently determine probable cause" is considered "bare bones" and cannot be the basis of an objectively reasonable good-faith

---

[21] Before trial, Marmolejo moved to suppress evidence obtained pursuant to three search warrants. Based on the affidavit of John Trevino, Special Agent of the Internal Revenue Service, Criminal Division, the government obtained three warrants to search Marmolejo's residence, ranch, and office. The warrant sought nine categories of items ranging from personal address and telephone books that would contain the addresses or telephone numbers of Marmolejo's associates to documents reflecting receipts or disbursements of money from Beltran to Marmolejo.

Salinas also sought to suppress evidence found pursuant to a search warrant that was also obtained based on Special Agent Trevino's affidavit. The warrant for Salinas' residence sought six categories of items ranging from personal address and telephone books that might contain Salinas' associates to a set of his and hers Rado watches given by Beltran to Salinas and his wife.

reliance by an officer.  *Id.*  We review *de novo* whether the good-faith exception to the exclusionary rule applies.  *Id.* at 321.

We conclude that the affidavit which supported the search warrants for Marmolejo's residence, ranch, and office and Salinas' residence contained sufficient facts from which the magistrate could determine probable cause.  The affidavit contains detailed first-hand observations by the affiant, as well as detailed information provided by informants whom the affiant establishes as reliable.[22]  It describes the bribery scheme between Beltran and Marmolejo in detail and Salinas' role in aiding and abetting it.[23]

---

[22]    For example, the affidavit states that confidential source number one, ("CS-1"):

> has provided information about Homero BELTRAN receiving special privileges and visits at the Hidalgo County Jail, as corroborated by CS-2, CS-3 and by testimony of a witness before the Federal Grand Jury in McAllen, Texas.  CS-1 has also provided information that Homero BELTRAN gave a 1989 Pontiac Trans-Am to Brigido MARMOLEJO JR., which has been independently corroborated by a record check with the Texas Department of Motor Vehicles and by statements made to law enforcement officers participating in this investigation by the current owner of the vehicle that Brigido MARMOLEJO JR., was the former owner of the vehicle.

Another example of the reliability of the confidential sources demonstrated in the affidavit is:

> CS-3 has provided information to your affiant and other law enforcement officers for the past three months as to the ownership of real estate by a convicted drug trafficker, Homero BELTRAN, and that Brigido MARMOLEJO JR. was involved in the proposed sale of the property, which has been corroborated by CS-1, CS-2, and independent investigation by your affiant and special agents assigned to the DEA OCDETF group in McAllen, Texas.

[23]    The affidavit explains that by September 1991, Beltran was receiving special privileges inside the jail because of an agreement that he had with a jail employee named Zavala.  It recounts how Marmolejo then met with Beltran and agreed to increase the frequency and duration of Beltran's visits with his family.  Initially, Beltran was to pay Marmolejo $5,000 per month for having at least one visit a week with his family.  The affidavit describes how the agreement was renegotiated to allow for three visits per week for $5,000 per week and $1,000 per visit.  The affidavit states that "CS-1 and CS-2 observed on several occasions Mario Salinas guarding the door to Brigido Marmolejo's office."

-27-

Many of the facts are corroborated by the observations of others and by taped conversations with Marmolejo which the affiant helped record.

Based on these facts, the magistrate could independently determine probable cause; therefore, the affidavit was more than "bare bones" which the officers could rely on in good faith. Since the officers acted in good faith in relying on the search warrants, we need not determine whether the warrants were supported by probable cause. We conclude that the defendants' motions to suppress were properly denied.[24]

VII

Salinas argues that his criminal prosecution was prohibited by the Double Jeopardy Clause. He contends that prior to his criminal trial, the government forfeited his property, two Rado watches,

---

The affidavit describes the watches that Beltran bought for Marmolejo and Salinas and their wives. It also explains that Beltran gave Marmolejo $11,000 to complete a pavilion that Marmolejo was building at his ranch for his daughter's wedding. The affidavit further states that, "CS-2 was present when Brigido MARMOLEJO JR. had taken Mario SALINAS to his ranch and showed him the pavilion. Brigido MARMOLEJO JR. stated that 'if it was not for Homero BELTRAN, I wouldn't have the pavilion.'"
The affidavit also details the many financial transactions that Marmolejo entered into with Beltran.

[24] Salinas also argues that the search exceeded the scope of the search warrant because officers searched his car which was not authorized in the search warrants. As result, Salinas argues, all evidence obtained in the search should be suppressed. However, Salinas does not state what evidence from the vehicles, was discovered and admitted at trial. The only items of evidence the government admitted at trial that was seized pursuant to the search warrants were two Rado watches seized from Salinas' residence and a telephone number list seized from Salinas' office. Under the severability doctrine, evidence that is illegally seized has no effect on the admissibility of legally seized evidence. *United States v. Willey,* 57 F.3d 1374, 1390 (5th Cir.), *cert. denied*, ___ U.S. ___, 116 S. Ct. 675, 133 L. Ed. 2d 524 (1995); *United States v. Hamilton,* 931 F.2d 1046, 1054 (5th Cir. 1991). Therefore, without any allegation of illegally seized evidence, Salinas' claim is without merit.

which constituted punishment for his crime, thereby precluding any subsequent punishment. The district court rejected Salinas' claim, finding that the government had suspended forfeiture proceedings and only intended to keep the watches as evidence for trial. We review the denial of a motion to dismiss on Double Jeopardy grounds *de novo. United States v. Arreola-Ramos,* 60 F.3d 188, 191 (5th Cir. 1995).

Salinas' property was seized by the DEA for forfeiture under 21 U.S.C. § 881 as property used or acquired as the result of a drug-related offense.[25] The DEA sent Salinas a Notice of Seizure in November 1993. The Notice informed Salinas that he could either request remission or mitigation of the forfeiture within thirty days of his receipt of the notice, or contest the forfeiture within twenty days of the first date of publication of the notice)) November 17, 1993. On December 30, 1993, Salinas sent a Petition for Remission, or in the Alternative for Mitigation of the Forfeiture which was then denied by the DEA. The DEA, however, never issued a Declaration of Forfeiture administratively forfeiting the watches.

Salinas argues that the watches were effectively forfeited when he failed to file a claim and post a bond contesting the forfeiture before the time for contesting expired on December 7, 1993. Salinas argues that this automatic forfeiture occurred

---

[25] The government's theory was that the watches had been purchased by Beltran with drug proceeds. Beltran was a well-known drug dealer who had made $4 to 5 million in profits from marijuana smuggling.

because of 21 C.F.R. § 1316.77(a).  Section 1316.77(a) provides

> For property seized by officers of the Drug Enforcement
> Administration, if . . . a claim and bond are not filed
> within the 20 days hereinbefore mentioned, the DEA
> Special Agent-in-Charge or DEA Asset Forfeiture Section
> shall declare the property forfeited.  The DEA Special
> Agent-in-Charge or DEA Asset Forfeiture Section shall
> prepare the Declaration of Forfeiture and fovard [sic] it
> to the Administrator of the Administration as
> notification of the action he has taken.

21 C.F.R. § 1316.77(a).  If Salinas were correct in arguing that
automatic forfeiture occurs once the twenty days expire, then there
would be no need for the statute to require that either the DEA
Special Agent-in-Charge or DEA Asset Forfeiture Section "declare
the property forfeited" and then prepare a "Declaration of
Forfeiture."  The statute would simply provide that the property is
automatically forfeited once the twenty days had expired.  We find
that instead of authorizing automatic forfeiture, the statute
authorizes the DEA to *declare* property forfeited when no person
files a claim within the required period.  *See United States v.
Baird,* 63 F.3d 1213, 1217 (3d Cir. 1995) ("Where no person files a
claim to the seized property within the statutory period, the
agency is *authorized* to declare the property forfeited.") (citing
19 U.S.C. § 1609(b) and 21 C.F.R. § 1316.77) (emphasis added),
*cert. denied,* ___ U.S. ___, ___ S. Ct. ___, ___ L. Ed. 2d. ___
(1996); *cf. Arreola-Ramos,* 60 F.3d at 190 (stating that once the
time for making a claim and posting a bond has expired, the seizing
agency automatically issues a declaration of forfeiture).  However,
if the agency does not issue a "Declaration of Forfeiture," the

-30-

property is not forfeited. *Cf. Arreola-Ramos,* 60 F.3d at 190 (stating that the *declaration of forfeiture* by a seizing agency has "the same effect as a final decree and order of forfeiture entered in a judicial proceeding").

The Ninth Circuit, in a case that is factually similar to this one, recently rejected the exact argument that Salinas makes. *See United States v. Sanchez-Cobarruvias,* 65 F.3d 781 (9th Cir.), *cert. denied,* ___ U.S. ___, 116 S. Ct. 797, ___ L. Ed. 2d ___ (1996). In *Sanchez-Cobarruvias,* United States Border Patrol Agents seized several guns from the defendant's car at which time the defendant filled out a Petition for Remission or Mitigation of Forfeiture form. The defendant was thereafter indicted for firearms violations. Customs officials then initiated civil administrative forfeiture proceedings against the defendant's car and sent him a Notice of Seizure explaining how the defendant could contest the forfeiture. After the twenty day claims period expired, the defendant moved to dismiss his criminal charges on double jeopardy grounds. The district court denied the motion, holding that no final disposition had taken place in the forfeiture proceedings; therefore, the property had not been forfeited, and jeopardy could not have attached. *Id.* at 782. The Ninth Circuit affirmed the district court's denial of the defendant's motion to dismiss on double jeopardy grounds based on its interpretation 19 U.S.C. § 1609(a), which contains similar procedures as 21 C.F.R.

§ 1316.77.[26]  The court stated,

> The fact that section 1609(a) uses mandatory rather than
> hortatory language means only that the government will
> declare seized property forfeited and proceed to auction
> it off, if there has been no challenge to the forfeiture
> proceedings; it does not mean that forfeiture is complete
> as a matter of law simply because the twenty days have
> passed.  Put another way, a Declaration of Forfeiture or
> final Disposition Order is not an empty gesture; it is
> the means whereby the government legally obtains title to
> seized property in order to dispose of it.

*Id.* at 783-84.  Because there had been neither  a Declaration of

Forfeiture nor a final Disposition Order, the Ninth Circuit held

that there had been no finality to the forfeiture proceeding.  *Id.*

at 784.  Therefore the defendant's property had not been forfeited,

and there was no double jeopardy bar to his criminal prosecution.

The DEA has never issued a Declaration of Forfeiture for

Salinas' watches.  Consequently, we hold that there has been no

finality to the forfeiture proceedings and therefore no forfeiture.

As a result, jeopardy has not attached in the first proceeding to

erect  any  potential  bar  to  Salinas'  subsequent  criminal

prosecution.

                              VIII

The district court departed upward in sentencing Marmolejo

based on its belief that he perjured himself at trial.  Marmolejo

argues that this was error because the court failed to give him

adequate notice of its intent to depart upward on this ground.  We

agree.

---

[26]     *See* 19 U.S.C. §§ 1608 and 1609(a) and (b).

-32-

Parties must be given notice and an opportunity to comment on matters relating to sentencing. FED. R. CRIM. P. 32(a)(1); *Burns v. United States,* 501 U.S. 129, 137 & 138, 111 S. Ct. 2182, 2187, 115 L. Ed. 2d 123 (1991). If the district court decides *sua sponte* to depart from the Sentencing Guidelines without providing adequate notice, "a critical sentencing determination will go untested by the adversarial process contemplated by Rule 32 and the Guidelines." *Burns,* 501 U.S. at 137, 111 S. Ct. at 2187.

In pronouncing Marmolejo's sentence, the district court stated that it was departing upward from the Guidelines based on its belief that he perjured himself at trial. Perjury was not mentioned in the Presentence Investigation Report as a ground for upward departure, and it is clear from the transcript of the sentencing hearing that Marmolejo's attorney did not have notice of this ground nor was he prepared to comment on it.[27] We hold that the district court erred by failing to give Marmolejo adequate notice of its intent to depart upward from the Guidelines, *see United States v. Moore,* 37 F.3d 169, 175 (5th Cir. 1994); *United States v. Williams,* 937 F.2d 979, 981 (5th Cir. 1991); therefore, we vacate his sentence and remand for resentencing.[28]

---

[27] When Marmolejo's attorney objected to his lack of notice of the court's intent, the court responded, "I'm giving it to you now."

[28] Marmolejo argues several other points of error, none of which have merit. First, Marmolejo argues that there was insufficient evidence to convict him of money laundering. Viewing the evidence in the light most favorable to the jury verdict, *see Puig-Infante,* 19 F.3d at 937, we find that a rational trier of fact could have found that the government proved beyond a reasonable doubt that Marmolejo was guilty of money laundering.

Marmolejo also contends that the district court erred by admitting hearsay

-33-

IX

For the foregoing reasons, we AFFIRM both defendants' convictions, but VACATE Marmolejo's sentence and REMAND for resentencing.

_____

evidence and disallowing other "critical impeachment evidence."  We find that the district court did not abuse its discretion.  *See United States v. Coleman*, 997 F.2d 1101, 1105 (5th Cir. 1993) ("Rulings limiting the scope or extent of cross-examination are committed to the sound discretion of the trial court and are reviewed only for abuse of discretion."), *cert. denied*, ___ U.S. ___, 114 S. Ct. 893, 127 L. Ed. 2d 86 (1994); *United States v. Vela,* 673 F.2d 86, 90 (5th Cir. 1982) (stating that we review a trial court's decision to admit business records for abuse of discretion).

E. GRADY JOLLY, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from Part II B of the majority's opinion. The majority holds that it is a federal crime for local jail officials to accept bribes for conjugal visits because conjugal visits constitute "business" or "transactions" of the Hidalgo County Jail. It reaches this conclusion even though the conduct in question did not affect federal funds directly or indirectly, the only congressional objective of this criminal statute. Moreover, the majority holds that these conjugal visits have a value of at least $5,000 based solely on the amount of the bribes received by the local jail officials. The majority thus enlarges the scope of this statute by effectively holding that the statute is violated whenever a bribe satisfies the transactional amount prescribed by the statute even when the transaction has no value to the jail and thus could have no effect on federal interests. With due respect for the majority, I am unable to agree with this virtually unlimited expansion of 18 U.S.C. § 666(a)(1)(B).

(1)

As noted in the majority opinion, the statute requires that the government prove that the defendants were agents of the Hidalgo County Jail, and that the jail received, in any one-year period encompassing the defendants' conduct, more than $10,000 in "benefits" from a "Federal program" involving a grant or contract. 18 U.S.C. § 666(a)(1), (b) (1994). The government further must

prove that the defendants, as agents of the jail, accepted "anything of value" from someone, and did so with the intent to be influenced or rewarded in connection with "any business, transaction, or series of transactions" of the jail "involving anything of value of $5,000 or more." § 666(a)(1)(B).

The majority concludes that the statute clearly encompasses the conduct of the defendants. I conclude that the statute clearly does not reach the conduct at issue. These two contrary positions, each supported by its own rationale, would lead one to conclude that the statute is ambiguous.

The majority parses the language of the statute to find clarity where, when fully considered, there is only ambiguity. Isolating words from the context of the statute, it focuses on "anything of value" instead of considering the whole of the phrase "any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more" so as to conclude that the statute is plain and clear that valuations can be from the perspective of any of the parties involved. The Second Circuit persuasively demonstrated the ambiguity involved in this point when it recently rejected the "clarity" proclaimed by the majority here, by stating: "§ 666(a)(1)(B) is silent as to the identity of the person or entity to whom the `[]thing' must have at least a $5,000 value."

United States v. Foley, 73 F.3d 484, 490 (2d Cir. 1996).[29]

In its effort to fulfill the elemental requirements of the statute, specifically that the "transactions" had a "value of $5,000," the majority confuses and then fuses the value of the transactions with the amount of the bribe. Yet, the two are completely distinct under the statute. The text of the statute makes clear that the acceptance of "anything of value," i.e., the acceptance of the bribe, is a separate element of the crime from the amount of the transaction; consequently, the amount of the bribe has no statutory relevance to the value of the transaction. Stated differently, the value of the transaction cannot automatically be extrapolated from the amount of the bribe, but instead must be established on grounds independent, at least in some way, of the bribe. Our decision in United States v. Westmoreland, 841 F.2d 572 (5th Cir.), cert. denied, 488 U.S. 820, 109 S.Ct. 62, 102 L.Ed.2d 39 (1988), illustrates the illogic of the majority's analysis in using the bribe to satisfy both the "anything of value" element of the crime and the "value of the transaction" element. There, a county supervisor accepted bribes totaling $2,202 in connection with the purchase of $14,482.92 worth of goods for the county. Id. at 575. The purchases made by the

---

[29]    The majority cites Westmoreland to support its claim that the statutory language is unambiguous. Maj. Op., at 11 n.7. The fact that we found the statutory language "plain and unambiguous" on one issue, namely, whether § 666(a)(1)(B) imposes a tracing requirement, does not mean that it is "plain and unambiguous" on all issues.

county supervisor constituted the series of transactions of the county "involving anything of value of $5,000 or more"; the bribes satisfied the "anything of value" element of the crime.  In short, as applied in this case, the language of § 666(a)(1)(B) is at best ambiguous insofar as it concerns the method of valuing a transaction.

(2)

Given this ambiguity, it is necessary to turn to the legislative history for guidance in interpreting and applying the statute.  Hightower v. Texas Hospital Association, 65 F.3d 443, 448 (1995).  Faced with legislative history that does not support its reading of the statute, however, the majority evades grappling directly with the legislative history.[30]  Instead, the majority falls back on generalized descriptions of that legislative history from our decision in Westmoreland.  The majority states that its broad reading of the language of the statute "squares with Congress's intent in enacting 18 U.S.C. § 666 to safeguard `the integrity of federal funds by assuring the integrity of the

---

[30]     The majority does quote a passage from the legislative history that directly contradicts its interpretation of § 666 without attempting to explain this contradiction:
> [18 U.S.C. § 666 was] designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program.

Maj. Op., at 11 (quoting S.Rep. No. 225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3510) (emphasis added).

organizations or agencies that receive them.'"  Maj.Op., at 11 (quoting 841 F.2d at 578).  The majority also states that "Congress `cast a broad net to encompass local officials who may administer federal funds, regardless of whether they actually do.'"  Id. at 12 (quoting 841 F.2d at 577).  Unfortunately, the majority quotes from Westmoreland without reviewing the context of the legislative history in which those descriptions arose.  Such a review demonstrates the majority's inappropriate use of these descriptions to support its overly-broad reading of the reach of the statute.

In Westmoreland, a county supervisor was convicted of receiving kickbacks for purchases of county materials that involved only non-federal funds of the county.  841 F.2d at 573.  The defendant argued that "the statute requires the involvement of federal, not merely state, funds in the allegedly corrupt transactions."  841 F.2d at 575.  After reviewing the statutory language and the legislative history, we said:

> [W]hile the legislative history manifests a congressional intent to preserve the integrity of federal funds, Congress specifically chose to do so by enacting a criminal statute that would eliminate the need to trace the flow of federal monies and that would avoid inconsistencies caused by the different ways that various federal programs disburse funds and control their administration."  Id. (emphasis added).

The court in Westmoreland thus recognized that the legislative history exhibited a clear intent to protect federal funds distributed to non-federal entities.  Recognizing the difficulty

involved in tracing federal funds, Westmoreland remained faithful to this congressional objective by holding that § 666 encompassed transactions involving non-federal funds of an entity receiving federal funds. Westmoreland did not hold that Congress meant to criminalize any act of bribery involving non-federal entities receiving federal funds, but only those acts of bribery that could somehow be traced, directly or indirectly, to the integrity of federal program funds. The majority's use of Westmoreland's generalized descriptions of the legislative history to support its overly-broad reading of the statute thus does not square with Westmoreland's own recognition of congressional purpose or the reasoning behind its holding.

Turning to the precise legislative history, I find that it clearly reveals that Congress did not intend for § 666(a)(1)(B) to be applied to conduct such as the acceptance of bribes to allow conjugal visits. Instead, Congress was only concerned with protecting the federal monies disbursed to non-federal entities. "This part of title XI is designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." 1984 U.S.C.C.A.N. at 3510 (emphasis added). Congress also stated that "the purpose of this section [is] to protect the integrity of the vast sums of money

-40-

distributed through Federal programs from theft, fraud, and undue influence by bribery." Id. at 3511.

The majority's attempt to find support in the circuit court cases cited in the legislative history, see Maj.Op., at 13 n.8; 1984 U.S.C.C.A.N. at 3511 & nn.2-3, will not withstand a careful look. None of the cases from the legislative history cited by the majority supports the majority's reading of § 666(a)(1)(B) because the conduct at issue in those cases directly implicated federal monies. United v. Hinton, 683 F.2d 195 (7th Cir. 1982) (soliciting money in exchange for award of housing rehabilitation contracts funded by HUD), aff'd sub nom., Dixson v. United States, 465 U.S. 482, 104 S.Ct. 1172, 79 L.Ed.2d 458 (1984); United States v. Mosley, 659 F.2d 812 (7th Cir. 1981) (receiving money in exchange for giving preferential treatment to individuals seeking jobs funded by Comprehensive Employment and Training Programs Act); United States v. Del Toro, 513 F.2d 656 (2d Cir.) (bribing city administrator to insure that program receiving funding from HUD would lease building), cert. denied, 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975). In this case, allowing conjugal visits to a federal prisoner, in no way that my eyes can see, implicates federal monies.

Furthermore, I have found nothing in the legislative history to indicate that Congress meant to reach acts of bribery--as the majority does--involving any and all official acts of agents of

non-federal entities in the same way that 18 U.S.C. § 201 reaches acts of bribery involving all official acts of federal agents.[31] Instead, Congress was focused on providing criminal sanctions precisely and only for abuse of, or threat to, federal monies that are disbursed to these non-federal entities. Westmoreland logically extends the reach of the statute--based on a recognition of the fungibility of money--to non-federal funds of that entity.

(3)

The majority's decision today also creates a split with the well-reasoned and more carefully crafted decision of the Second Circuit in United States v. Foley.[32] In Foley, a Connecticut legislator was convicted of receiving a bribe to help secure the passage of legislation that would have given a recently-merged bank a one-year exemption from a divestiture requirement. 73 F.3d at 486-87. Although the defendant received a $25,000 bribe and the exemption was worth more than $5,000 to the bank, the Second Circuit held that the transaction did not meet the "$5,000 or more" requirement of § 666(a)(1)(B) because the government had not shown

---

[31] Section 201 reads in part: "Whoever, being a public official . . . accepts . . . anything of value . . . for being influenced in the performance of any official act . . . shall be . . . imprisoned . . . ." 18 U.S.C. § 201(b) (1994). Congress was well aware of this provision when it passed § 666 because a circuit split concerning § 201's application to non-federal entities motivated congressional action on § 666. See 1984 U.S.C.C.A.N. at 3510-11.

[32] Surprisingly, the majority supports its holding by citation to United States v. Mongelli, 794 F.Supp. 529, 531 (S.D.N.Y. 1992), Maj. Op., at 11, 15, a decision overruled by the Second Circuit in Foley. See 73 F.3d at 496 (Lumbard, J., dissenting).

-42-

that the exemption was worth at least $5,000 to the State of Connecticut. "[T]he exemption affected neither the financial interests of the protected organization nor federal funds directly." Id. at 493. Based on a clear understanding of the congressional objective in enacting § 666, the Second Circuit determined that the proper method to value a transaction is from the perspective of the protected entity, not from the perspective of "any willing buyer," as the majority would have us accept. Maj.Op., at 15. The Foley court stated:

> [T]he value of a thing for purposes of § 666(a)(1)(B) is not to be assessed by reference to any and every perspective or measure of value, no matter how subjective or arbitrary. Instead, the assessment of the thing's value must be connected, even if only indirectly, to the integrity of federal program funds.

73 F.3d at 490.

In an effort to distinguish Foley from these facts and from Fifth Circuit law, the majority contends that the defendant in the Fifth Circuit's Westmoreland decision would not have been convicted under Foley because the transaction in that case did not involve federal funds. Maj.Op., at 15 n.9. Based on two quoted passages from Foley mentioning federal funds, the majority strains to conclude that the Foley Court held that federal funds must be involved in the transaction and that, therefore, the decision conflicts with Westmoreland. Id. A casual reading of Foley will reveal the majority's erroneous interpretation of that decision.

First, _Foley_ cites with approval our decision in _Westmoreland_. 73 F.3d at 491. Second, the _Foley_ Court noted that the Second Circuit has already held that the government is not required to trace the corrupt transaction to federal program funds. _Id._ at 490-91 (citing _United States v. Coyne_, 4 F.3d 100, 108-10 (2d Cir. 1993), _cert. denied_, ___ U.S. ___, 114 S.Ct. 929, 127 L.Ed.2d 221 (1994)).[33] Third, the _Foley_ Court recognized that the corrupt transaction violated § 666(a)(1)(B) if it affected _either_ "the financial interests of the protected organization" _or_ "federal funds directly." _Id._ at 493. The majority's attempt to distinguish _Foley_ is, I respectfully submit, superficial.

### (4)

Finally, I would observe that when a criminal statute only ambiguously applies to the conduct in question, surely the rule of lenity counsels that we construe the statute in favor of the defendant. _Liparota v. United States_, 471 U.S. 419, 427, 105 S.Ct. 2084, 2089, 85 L.Ed.2d 434 (1985).

### (5)

To summarize, in interpreting § 666(a)(1)(B), we first must look to the specific statutory language, and in the light of its ambiguity, the legislative history, to determine whether _this_

---

[33] The _Coyne_ court itself recognized that it "agree[s] with the other circuits who have considered the question," including _Westmoreland_. 4 F.3d at 110.

provision intends to reach <u>this</u> conduct.  <u>Dowling v. United States</u>, 473 U.S. 207, 213, 105 S.Ct. 3127, 3131, 87 L.Ed.2d 152 (1985) ("[W]hen assessing the reach of a federal criminal statute, we must pay close heed to language, legislative history, and purpose in order strictly to determine the scope of the conduct the enactment forbids").  Neither the plain language nor the legislative history indicates that Congress wrote this provision to reach the acceptance of bribes for conjugal visits, conduct that left both federal and state fiscs untouched.  Congress intended to reach only conduct involving--directly or indirectly--the fiscal integrity of non-federal entities receiving federal monies.  Because the defendant's conduct in no discernable way implicated the fiscal integrity of the Hidalgo County Jail, and because the majority's reading of the statute contradicts the clear expression of congressional intent in the legislative history, I respectfully dissent.